A05A0306, A05A0307. LEDFORD et al. v. SMITH et al.;
and vice versa.
(618 SE2d 627)

</div>

ELLINGTON, Judge.

In Case No. A05A0306, Jimmy Ledford, Larry O'Dell, Bryan Walker, Signature Leasing Corporation, LLC, and Dyna-Vision Group, LLC (plaintiffs below) appeal from an order of the Murray County Superior Court granting partial summary judgment in favor of

Brenda Smith, Bryan Ownbey, Bob Thomas, and Signature Hospitality Carpets, LLC (defendants below). In Case No. A05A0307, Smith, Ownbey, Thomas, and Signature Hospitality Carpets, LLC, cross-appeal, contending the trial court erred in denying them complete relief by finding that material issues of fact remained on the plaintiffs'/appellants' surviving claims.

Summary judgment is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). A de novo standard of review applies to an appeal from an order either granting or denying summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant. *Desai v. Silver Dollar City, Inc.*, 229 Ga. App. 160, 163 (1) (493 SE2d 540) (1997). So viewed, the record reveals the following.

### Creation and Structure of SHC

In 1998, Dyna-Vision Group, LLC (a company owned by Ledford, O'Dell, Walker and two others) joined with individuals Smith, Ownbey, and Thomas to form Signature Hospitality Carpets, a limited liability company ("SHC"). SHC sold carpet to the hospitality industry. SHC's ownership was divided between the "Active Members" (Smith, Ownbey and Thomas) and Dyna-Vision. The Active Members were full-time, terminable-at-will employees and corporate officers of SHC. SHC's Operating Agreement provided that "[t]he business and affairs of the Company shall be managed by the Members through a Board of Directors." Both Dyna-Vision and the Active Members could elect three directors each to SHC's board. The board was comprised of Smith, Ownbey, Thomas, Ledford, O'Dell, and Dyna-Vision's accountant, Ed Staten. Dyna-Vision's express function within SHC was to provide "credit" and "general management assistance."

### Key Provisions of SHC's Operating Agreement

SHC's Operating Agreement provided that either Dyna-Vision or the Active Members could, at any time, trigger a buy-out or "Mandatory Put and Call" that would force a sale of Dyna-Vision's or the Active Members' interest in SHC to the other. Paragraph 9.5 of the agreement provided:

> *Mandatory Put and Call.* At any time Dyna-Vision or the Active Members by majority vote within that group, may set a price per percentage Interest and give written notice of that price to the other group, (the "Notice of Offer to Sell or Purchase"). The Members receiving the Notice of Offer to Sell or Purchase shall have thirty (30) calendar days to decide whether to sell all their Interest at that price or to purchase all the Interest of the group giving Notice of Offer to Sell or Purchase at the Price set forth in the Notice of Offer

to Sell or Purchase. If the Members receiving the Notice of Offer to Sell or Purchase fails to make an election, . . . the Members receiving the Notice of Offer to Sell or Purchase shall have to sell their Interest at the price set forth in the Notice of Offer to Sell or Purchase.

The agreement also contained a right of first refusal provision that required both Dyna-Vision and the Active Members to give notice to the other of an intended sale to a third party of their interest in SHC. Paragraph 9.2.1 of the agreement provided:

> ***Notice of Intended Disposition.*** No Member in the Company may sell less than all their Interest, and in the event a Member receives a bona fide offer from any person in an arms-length transaction to purchase all of the Interest which they own in the Company and if the person receiving the offer of purchase desires to sell all the Interest that is the subject of the offer, notice of the desire to sell the Interest shall be given in writing to the other Members and the terms of the offer, which notice shall include the price offered, the name of the offeror, and the payment terms (the "Notice of Intended Disposition").

A member's "Interest" in SHC was defined in Paragraph 1.11 of the agreement as "a Member's ownership interest in the Company, including any and all benefits to which such Member is entitled pursuant to this Agreement, together with all obligations of such Member to comply with the terms and conditions of this Agreement." Paragraph 6.4 of the agreement provided that SHC's directors and officers "shall act in a manner they believe in good faith to be in the best interest of the Company and with such care as an ordinarily prudent person in a like position would use under similar circumstances." And finally, Paragraph 7.3 provided:

> ***Activities of Member and Affiliates.*** Notwithstanding the provisions of OCGA § 14-11-307 of the [Georgia Limited Liability Company] Act, the Members acknowledge and agree that the Members and their respective Affiliates are presently, or may become in the future, general partners of partnerships, managers of other limited liability companies, or associated in some other manner with other businesses. The Members and their respective Affiliates may engage in all such other business ventures, including without limitation ventures involving the purchase, sale and operation of other businesses, but no Active Member shall engage in

businesses similar to the business of the Company by competing with the business of the Company while they are employed with the Company, except for business associations of Active Members with Vista Carpet Industries, LLC.

### Initial Negotiations to Sell SHC to Peeples

In December 2001, Shelby Peeples, an individual involved in the carpet industry, approached Dyna-Vision's owners and expressed an interest in purchasing all or part of SHC. On January 9, 2002, Dyna-Vision's owners and the Active Members met to discuss the possibility of a sale. They discussed several plans, including selling the entire corporation to Peeples for between $10 and $12 million. Although most of those present wanted to sell, Dyna-Vision's Jim Ledford opposed selling because he believed the company was worth more. After reviewing SHC's financial records and after later, separate meetings with the Active Members and Dyna-Vision's owners, Peeples offered Dyna-Vision $2.5 million for its share of SHC. Dyna-Vision's negotiator called the offer "insulting." No one from Dyna-Vision ever informed the Active Members of this offer in writing as required by the Operating Agreement.

On January 10, Smith left Walker a telephone message stating she believed the negotiations had failed and that Dyna-Vision's owners and the Active Members should meet to discuss the future of SHC. On January 11, 2002, Walker called Ownbey at SHC to arrange the meeting. Ownbey, however, informed Walker that Smith's requested meeting was cancelled because Peeples had made the Active Members an offer they intended to accept. Later that day, Dyna-Vision's owners and the Active Members met to discuss the offer. The Active Members presented a memorandum setting out the details of an offer they had received to purchase their interest in SHC. Although this memorandum did not indicate a purchase price or identify a purchaser, Dyna-Vision's owners believed the offer was from Peeples. About a week after this meeting, Smith and Ownbey told Ledford "we don't have an offer." Ledford deposed that the Active Members represented that Peeples had withdrawn the offer. Peeples deposed that he did not make the offer and stated that the supposed outside offer was in fact an attempt by the Active Members to buy-out Dyna-Vision.

### The Active Members' Negotiations with Peeples

On January 21, 2002, Peeples sent the Active Members a "letter of intent" in which he proposed a plan to acquire SHC. Peeples proposed to lend the Active Members $3.5 million upon "the condition precedent that the Active Members acquire the Dyna-Vision interest." Further, the loan would be secured by an interest in SHC's assets. This included an interest in "the land and building where the

business of [SHC] is conducted[,]" which was known as "the Green Road property." Peeples also proposed to purchase all of SHC's assets if and when SHC actually acquired Dyna-Vision's interest. The letter of intent contained proposed employment and confidentiality clauses. It also acknowledged in a "Conflicting Obligations" provision that SHC was bound by its Operating Agreement and that the Active Members should honor those obligations. Although the Active Members did not disclose the letter of intent to anyone with Dyna-Vision, there is some evidence that Dyna-Vision's owners nevertheless knew that Peeples was negotiating separately with the Active Members and "funding the breakup of [SHC]."

### The Active Members' Mandatory Put and Call

On February 8, 2002, the Active Members decided to trigger the mandatory put and call provision of the Operating Agreement and offer Dyna-Vision $3.5 million for its share of SHC. On February 25, 2002, the Active Members presented a "Notice of Offer to Sell or Purchase" to Dyna-Vision.

After receiving the notice, Dyna-Vision's owners contacted several lenders about possibly financing the purchase of the Active Members' share of SHC. Dyna-Vision did not disclose those financing meetings to the Active Members. While deciding whether to buy or sell the Active Members' interest in SHC, Ledford requested financial information from SHC. Whether any individual Active Member withheld financial information from Dyna-Vision is disputed. The record reveals, however, that Dyna-Vision had access to SHC's books through Ed Staten, a board member of both Dyna-Vision and SHC. Also, SHC's 2001 year-end financial statements were available to Dyna-Vision before it had to elect whether to buy or to sell.

Finally, there is some evidence that Dyna-Vision could not raise the $3.5 million to purchase SHC and, even if it could, SHC would have no value to Dyna-Vision without the Active Members in place as the operating group. In any event, Dyna-Vision elected to sell its share of SHC.

### The Green Road Property

In late March or early April 2002, shortly before the Active Members' acquisition of Dyna-Vision's interest in SHC was scheduled to close, Dyna-Vision's Ledford and O'Dell deposed that they discovered that the business premises out of which SHC operated — the Green Road property — had been mistakenly conveyed by warranty deed from Signature Leasing Corporation ("SLC") to SHC. The conveyance had occurred just after SHC's October 2001 loan consolidation with First National Bank of Chatsworth ("FNBC"). Because Dyna-Vision's owners believed the property was not an asset of SHC, they made a formal written demand on April 11, 2002 for the property's return as a condition to closing on the buy-out; however,

SHC refused to reconvey the property. Smith deposed: "Nobody ever told me there was a way to [reconvey the property to SLC], and we had borrowed money based on the building being collateral. I'm not a banker. I'm not a lawyer. I'm not an accountant. I did what I thought [I] was required to do."

The record reveals that Ledford, O'Dell, Walker, Smith, and Ownbey formed SLC, a limited liability company, to purchase and hold the Green Road property. SLC then leased the property to SHC. SHC refinanced and consolidated its debts with FNBC in October 2001, two months before the negotiations with Peeples began. The parties knew that the Green Road property, which was owned by SLC, was to be used as collateral for the new loan. On October 24, 2001, during the closing on the refinancing, the parties signed a "Warranty Deed to Secure Debt" between FNBC and "Signature Hospitality Carpets." Part of the loan proceeds were used to pay off SLC's existing mortgage on the Green Road property.

At some point after closing on the refinancing, a loan officer with FNBC discovered that the corporation referenced in the title opinion for the Green Road property, SLC, differed from the corporation listed on the deed to secure debt, SHC. The loan officer asked the closing attorney to draft a "corrective paper" for the parties to sign. Once the document was prepared, the loan officer contacted Smith about signing it and Smith contacted the remaining signers, all of whom individually went to the bank to sign the document. The loan officer did not convey to Smith the legal import of this new document. And although Smith deposed that when she signed the document she knew it was a deed transferring title, she explained that "I understood we had done this in October. . . . I'm not in the habit of calling things collateral assignments or warranty deeds. . . . I would have just said 'document.' . . . It was our intention when we borrowed the money that that's what we had to do, use the building for collateral."

Ledford deposed that based upon his brief conversation with Smith, he went to the bank to sign the document Smith said "was left out of the original closing." Smith did not tell Ledford what the document was. The one-page corrective paper the parties signed but failed to read was plainly labeled "**WARRANTY DEED**" and transferred title from SLC to SHC. Based upon affidavit, deposition, and documentary evidence of record, it does not appear that the parties intended to transfer ownership from SLC to SHC.

### *The Buy-Out of Dyna-Vision's Interest and the Sale of SHC's Assets*

On April 30, 2002, Dyna-Vision and the Active Members closed on the sale of Dyna-Vision's interest in SHC to the Active Members for $3.5 million, which the Active Members financed with a loan from Peeples. On May 7, 2002, SHC sold its assets to PFLC, a company

controlled by Peeples. PFLC paid SHC $2.5 million for its assets and Peeples forgave the $3.5 million loan to the Active Members.

### The Lawsuits

On July 11, 2002, Dyna-Vision made another written demand that SHC reconvey the Green Road Property to SLC. When SHC refused, the plaintiffs/appellants (Dyna-Vision, Ledford, O'Dell, Walker, and SLC) filed suit, claiming mutual mistake and unjust enrichment with respect to the transfer of the Green Road property; fraud in both the transfer of the Green Road property and in the buy-out of Dyna-Vision's share of SHC; and breach of fiduciary duties owed by the Active Members to Dyna-Vision in handling SHC's finances and in conducting the buy-out. The defendants/cross-appellants (Smith, Ownbey, Thomas, and SHC) filed a motion for summary judgment. Following a hearing on the motion, the superior court granted partial summary judgment in favor of the defendants/cross-appellants on the issues of "Fraudulent Inducement in the Put/Call," "Unjust Enrichment," "Usurping Corporate Opportunities," and "[Breach of] Contractually Created [Fiduciary] Duties," but denied the motion as to the remainder of the complaint, concluding that material issues of fact remained for trial. These appeals followed.

### Case No. A05A0306

1. Dyna-Vision contends the superior court erred in granting partial summary judgment in favor of the Active Members on these two issues: (a) whether the Active Members breached a contractual duty under the Operating Agreement to disclose that their buy-out offer to Dyna-Vision was funded by a third party, and (b) whether the Active Members fraudulently induced the buy-out concealing or misrepresenting Peeples' involvement in the buy-out.

(a) *Contractual Duties.* In support of its claim that the Active Members breached their contractual duties, Dyna-Vision argues that Paragraph 9.2.1 of the Operating Agreement required the Active Members to disclose that they were negotiating with Peeples to provide financing for the buy-out. However, that paragraph, which is part of the Right of First Refusal provisions, only required the Active Members or Dyna-Vision to disclose to the other any bona fide offer from a third party to "purchase" their "ownership interest" in SHC. As the superior court correctly concluded, this provision was plainly "intended to prevent outsiders from buying into [SHC]. In this way, the Members maintained control over who their business 'partners' were to be." Because the Active Members' proposed buy-out of Dyna-Vision's interest would not allow a third party to buy into SHC and become Dyna-Vision's business partner, the purpose of the right of first refusal was not implicated. Therefore, Paragraph 9.2.1 did not

require the Active Members to disclose to Dyna-Vision how it intended to finance its buy-out offer. Thus, even if this provision contained some ambiguity, we find no error in the trial court's construction of this portion of the agreement. See *Mountain Aire Realty v. Birdie White Enterprises*, 265 Ga. App. 366, 368 (593 SE2d 900) (2004) ("The cardinal rule of contract construction is to ascertain the intention of the parties.") (footnote omitted).

Further, Dyna-Vision has shown us nothing which suggests that the Active Members agreed to allow Peeples to buy into SHC through the asset purchase proposal. Peeples' proposal to acquire SHC's assets was to secure the making of a loan — a loan that would only be made if and when the Active Members obtained Dyna-Vision's ownership interest through the exercise of the mandatory put and call. Upon the occurrence of that contingency, the right of first refusal provisions of the Operating Agreement would become moot since Dyna-Vision would no longer be an owner in SHC possessing a right of first refusal. Moreover, Peeples did not actually purchase SHC's assets until after the Active Members acquired Dyna-Vision's interest in SHC. Therefore, neither the financing for the buy-out nor the asset purchase arrangement implicated the disclosure provisions of Paragraph 9.2.1 of the Operating Agreement. Consequently, the trial court did not err in granting summary judgment to the defendants/cross-appellants on the issue of whether the operating agreement required the Active Members to disclose to Dyna-Vision Peeples' involvement in the buy-out.

(b) *Fraud.* Dyna-Vision also contends the superior court erred in granting summary judgment on the issue of whether the Active Members committed fraud when they failed to disclose to Dyna-Vision their negotiations and agreements with Peeples and when they affirmatively denied that Peeples was involved in the buy-out.

A fraud claim has five elements: (a) a false representation by the defendant, (b) scienter, (c) an intent to induce the plaintiff to act or refrain from acting, (d) justifiable reliance by the plaintiff, and (e) damage to the plaintiff. *Crawford v. Williams*, 258 Ga. 806 (375 SE2d 223) (1989); *Pyle v. City of Cedartown*, 240 Ga. App. 445, 447 (1) (524 SE2d 7) (1999).

First, pretermitting whether Peeples' involvement in the buy-out was material to Dyna-Vision's decision to buy or sell, the "[s]uppression of a material fact is fraud only if there is a duty to disclose arising from a fiduciary relationship or the particular circumstances of the case." (Footnote omitted.) *Bogle v. Bragg*, 248 Ga. App. 632, 636 (1) (548 SE2d 396) (2001). As we explain in Division 1 (a), supra, and Division 2, infra, the Active Members had no contractual, statutory, or fiduciary duty to disclose Peeples' involvement in the buy-out.

Moreover, even if the Active Members had a fiduciary relationship with Dyna-Vision with respect to the buy-out, Peeples' involvement was immaterial. By the express terms of the Operating Agreement, when Dyna-Vision was presented with the mandatory put and call, it was required to buy or sell. Either the Active Members' interest in SHC was worth $3.5 million to Dyna-Vision or it was not. The fact that Peeples financed the offer could not have materially affected Dyna-Vision's decision-making with respect to SHC's value, because if Dyna-Vision chose to buy the Active Member's interest, it could not force Peeples (or any other prospective buyer) to buy SHC for a fixed price. And there is no evidence in the record that Dyna-Vision had an interested buyer or that SHC had any value to any other prospective buyer. Moreover, both Ledford and O'Dell deposed that, even if they could have raised the money to buy out the Active Members, owning SHC without the Active Members would have been "foolish" and "made no sense" because the Active Members were the heart of SHC's value. As O'Dell admitted "we didn't really have a choice. . . . We didn't have a management group. . . . The day the put and call came in, I wouldn't give two cents for finding a group to replace them." Because Peeples' involvement did not affect the value of the Active Members' interest, it was immaterial. Or, stated differently, the plaintiffs/appellants cannot show that they suffered any damage as a result of their alleged reliance on the Active Members' affirmative misrepresentation that Peeples was not involved in the buy-out. See *Cross v. Tokio Marine & Fire Ins. Co.*, 254 Ga. App. 739, 742 (1) (563 SE2d 437) (2002) (The plaintiffs could not show that they would have made a greater recovery but for the misrepresentation; consequently, they could not prove causation or damages, which were essential to their fraud claims.).

Because the Active Members had no duty to disclose Peeples' involvement, and because any concealment of or misrepresentation about Peeples' involvement could not have materially affected Dyna-Vision's decision to sell, the trial court did not err in granting the defendants/cross-appellants summary judgment as to this issue.

### Case No. A05A0307

The defendants/cross-appellants contend the trial court erred in denying their motion for summary judgment on Dyna-Vision's claims for mutual mistake and fraud in the transfer of the Green Road property and for breach of a fiduciary duty to disclose Peeples' involvement in the buy-out. The defendants/cross-appellants also contend the trial court should have granted them summary judgment because the plaintiffs/appellants suffered no damage as a result of the buy-out. Finally, they argue the trial court should have granted

partial summary judgment as to certain parties because some of the plaintiffs/appellants lack standing to contest the buy-out or the transfer of the Green Road property.

2. *Breach of Fiduciary Duties and Damages in the Buy-Out.* The defendants/cross-appellants contend the superior court erred in denying their motion for summary judgment on plaintiffs'/appellants' claim that Smith, Ownbey, and Thomas, as officers and directors of SHC, breached a fiduciary duty of loyalty to disclose their negotiations with Peeples to Dyna-Vision. They also contend that the plaintiffs/appellants can show no damage as a result of any failure to disclose that information.

(a) As we explained in Division 1 (a), supra, the Operating Agreement did not require the Active Members to disclose their negotiations and financing arrangement with Peeples to Dyna-Vision. Further, any duties that members of a limited liability company owe to each other and to the LLC are set forth in the Georgia Limited Liability Company Act, OCGA § 14-11-100 et seq. In relevant part, the Act provides that "[i]n managing the business or affairs" of a limited liability company:

> (1) A member or manager shall act in a manner he or she believes in good faith to be in the best interests of the limited liability company and with the care an ordinarily prudent person in a like position would exercise under similar circumstances. A member or manager is not liable to the limited liability company, its members, or its managers for any action taken in managing the business or affairs of the limited liability company if he or she performs the duties of his or her office in compliance with this Code section. Except as otherwise provided in the articles of organization or a written operating agreement, a person who is a member of a limited liability company in which management is vested in one or more managers, and who is not a manager, shall have no duties to the limited liability company or to the other members solely by reason of acting in his or her capacity as a member; . . .

> (4) To the extent that, pursuant to paragraph (1) of this Code section or otherwise at law or in equity, a member or manager has duties (including fiduciary duties) and liabilities relating thereto to a limited liability company or to another member or manager:

> (A) The member's or manager's duties and liabilities may be expanded, restricted, or eliminated by provisions in the

articles of organization or a written operating agreement; provided, however, that no such provision shall eliminate or limit the liability of a member or manager:

(i) For intentional misconduct or a knowing violation of law; or

(ii) For any transaction for which the person received a personal benefit in violation or breach of any provision of a written operating agreement; and

(B) The member or manager shall have no liability to the limited liability company or to any other member or manager for his or her good faith reliance on the provisions of a written operating agreement, including, without limitation, provisions thereof that relate to the scope of duties (including fiduciary duties) of members and managers.

OCGA § 14-11-305.

Pursuant to this Code section, any fiduciary duties that a member of an LLC has may be modified or eliminated (with a few exceptions) by the operating agreement. *Stoker v. Bellemeade*, 272 Ga. App. 817, 825 (3) (615 SE2d 1) (2005). As we explained,

[t]he contractual flexibility provided in [OCGA § 14-11-305] is consistent with OCGA § 14-11-1107 (b) of the LLC Act which provides that: "It is the policy of this state with respect to limited liability companies to give maximum effect to the principle of freedom of contract and to the enforceability of operating agreements."

Id.

Paragraph 7.3 of the Operating Agreement at issue in this case specifically acknowledged that SHC's members either were or could become "associated in some other manner with other businesses" and that that activity might implicate OCGA § 14-11-307, pertaining to conflicting interest transactions and the duty to disclose them. Therefore, "notwithstanding" that Code section, the agreement allowed its members to

engage in all such other business ventures, including without limitation ventures involving the purchase, sale and operation of other businesses, but no Active Member shall engage in businesses similar to the business of the Company by competing with the business of the Company while they

are employed with the Company, except for business associations of Active Members with Vista Carpet Industries, LLC.

This provision gave the Active Members wide latitude to engage in all other business activities except those "similar to the business of" SHC, that is, a "competing" carpet company. The provision was broad enough to allow the Active Members to negotiate with Peeples for the purpose of obtaining financing to fund their buy-out of Dyna-Vision's interest in SHC. This activity did not "compete" with SHC; thus, it did not fall within the exception. Any fiduciary duty of disclosure that the Active Members may have owed Dyna-Vision with respect to such a business arrangement was eliminated by the terms of an operating agreement that allowed the business activity which occurred. See *Stoker v. Bellemeade*, 272 Ga. App. at 824 (members of an LLC did not breach fiduciary duties by participating in other allegedly competing real estate developments because operating agreement allowed them to do so).

(b) Finally, for the reasons set out in Division 1 (b), supra, we agree that Dyna-Vision cannot establish that it was damaged as a result of the Active Members' breach of any fiduciary duty to disclose their deal with Peeples. The defendants/cross-appellants are entitled to summary judgment on all claims pertaining to the buy-out of Dyna-Vision's interest in SHC.

3. *Fraud in the Transfer of the Green Road Property.* The defendants/cross-appellants contend the superior court erred in denying their motion for summary judgment on the plaintiffs'/appellants' fraud claims arising from Smith's failure to disclose that the corrective paper that Ledford and O'Dell signed was a warranty deed transferring the Green Road property from SLC to SHC.

We set forth the elements of fraud in Division 1 (b), supra. "For an action for fraud to survive a motion for summary judgment, there must be some evidence from which a jury could find each element of the tort." (Citation and punctuation omitted.) *Cobb County School Dist. v. MAT Factory*, 215 Ga. App. 697, 701 (2) (a) (452 SE2d 140) (1994).

In this case, the evidence shows that FNBC, on its own initiative, drafted the warranty deed and asked all the parties to the loan closing to sign this "corrective paper." Although Ledford and O'Dell contend they signed the document because Smith asked them to do so, the evidence only shows that Smith was relaying the *bank's* request. There is no evidence in the record that Smith caused the deed to be drafted, acted in concert with the bank, or misrepresented or concealed the document's nature. In fact, it appears from the record that Smith was as ignorant of the document's significance as Ledford and

O'Dell. Under these circumstances, we see no evidence of a fraudulent statement or the concealment of a material fact that Smith was under a duty to disclose.

Further, no one prevented Ledford and O'Dell from reading the document they signed. It was plainly marked "**WARRANTY DEED**." "Fraud cannot be the basis of an action if it appears that the party alleging the fraud had equal and ample opportunity to prevent it and yet made it possible through the failure to exercise due diligence." (Citation omitted.) *Middleton v. Troy Young Realty*, 257 Ga. App. 771, 773 (b) (572 SE2d 334) (2002). "It is settled law in this State that a party to a contract who can read must read, or show a legal excuse for not doing so, and that fraud which will relieve a party who can read must be *such as prevents him from reading*." (Citations and punctuation omitted; emphasis supplied.) *Cox v. Smith*, 244 Ga. 280, 283 (1) (260 SE2d 310) (1979). Nothing Smith did or said prevented Walker and O'Dell from reading the document they signed. Consequently, the defendants/cross-appellants are entitled to summary judgment on the plaintiffs'/appellants' fraud claims arising from the transfer of the Green Road property.

4. *Mutual Mistake in the Transfer of the Green Road Property.* The defendants/cross-appellants contend the trial court erred in denying them summary judgment on the plaintiffs'/appellants' claim that the transfer of the Green Road property should be set aside on the ground of mutual mistake. "In all cases where the form of the conveyance or instrument is, by mutual mistake, contrary to the intention of the parties in their contract, equity will interfere to make it conform thereto." (Citations and punctuation omitted.) *Eaton Yale & Towne, Inc. v. Strickland*, 228 Ga. 430, 434 (2) (a) (185 SE2d 923) (1971). See also OCGA § 13-5-4 (accord). The Supreme Court has explained that

> [a] petition for reformation of a written contract will lie where by mistake of the scrivener and by oversight of the parties, the writing does not embody or fully express the real contract of the parties. The cause of the defect is immaterial so long as the mistake is common to both parties to the transaction. And the negligence of the complaining party will not defeat his right to reformation if the other party has not been prejudiced.

(Punctuation and footnotes omitted.) *Curry v. Curry*, 267 Ga. 66, 67 (1) (473 SE2d 760) (1996). "The term 'mistake' refers to some unintentional act, or omission, or error, arising from ignorance, surprise,

imposition, or misplaced confidence." (Punctuation and footnote omitted.) *Yeazel v. Burger King Corp.*, 241 Ga. App. 90, 94 (2) (526 SE2d 112) (1999). "Such a mistake may be one of fact or of law." (Footnote omitted.) Id.

> A "mutual mistake" means a mistake shared by, or participated in by, both parties, or a mistake common to both parties, or reciprocal to both parties; both must have labored under the same misconception in respect of the terms and conditions of a written instrument, intending at the time of the execution of the instrument to say one thing and by mistake expressing another, so that the instrument as written does not express the contract or intent of either of the parties. A mutual mistake is one in which both parties participate by each laboring under the same misconception. In an action for reformation based upon an alleged mutual mistake, the parol evidence rule does not bar introduction of testimony as to the oral agreement reached by the parties which the writing was intended to reflect. Such parol evidence is admissible even though the party seeking reformation signed the contract. The fact that the parol evidence contradicts the language of the written document clearly does not bar its admissibility, since the gist of a reformation action is that the written document does not accurately reflect the parties' agreement.

(Citations and footnotes omitted.) Id. at 94-95 (2). Finally, "there is no rule that reformation will be denied unless the mistake [is] admitted by both parties." (Citation omitted.) *Fox v. Washburn*, 264 Ga. 617, 618 (1) (449 SE2d 513) (1994).

In this case, the evidence adduced would allow a jury to infer that when the members of SLC signed the "corrective paper" supplied by the bank after closing, the members thought, mistakenly, that they were signing another warranty deed to secure debt, since that is what they had done before and that is what the record evidence strongly suggests they intended. There is no evidence that the bank or anyone else informed the members that the "Warranty Deed" had a legal effect different from the previously executed "Warranty Deed to Secure Debt." And, as the superior court correctly held, the parties' failure to read the warranty deed does not defeat a claim for mutual mistake. *Curry v. Curry*, 267 Ga. at 67 (1) ("[T]he negligence of the complaining party will not defeat his right to reformation if the other party has not been prejudiced.") (footnote omitted). Regarding the question of prejudice, the Supreme Court of Georgia explained that a party "cannot be hurt by reforming the instrument, so as to keep them

from getting what they did not buy." (Citation and punctuation omitted.) *Fox v. Washburn,* 264 Ga. at 619 (2).

That *Dyna-Vision* closed on the mandatory buy-out does not, as a matter of law, act to ratify *SLC's* transfer of the Green Road property. Dyna-Vision did not own the Green Road property. It and SLC are not the same corporate entities. The defendants/cross-appellants have not adduced evidence establishing that there exists such a unity of interest and ownership between SLC and Dyna-Vision that the separate personalities of the corporation and the owners no longer exist so that "piercing the corporate veil" is demanded. See *Heyde v. Xtraman, Inc.,* 199 Ga. App. 303, 306 (2) (404 SE2d 607) (1991). Further, the defendants'/cross-appellants' argument that SLC "ratified" the transfer by "keeping" the loan proceeds is not supported by the record before us. Although SLC's mortgage was extinguished during the loan consolidation and refinancing, there is no evidence that SLC realized any actual benefit from that event that it could return — the refinancing inured to SHC's benefit, SHC obtained both title to the Green Road property and any equity in the property, and then SHC pledged the property as collateral to the bank.

Given the record before us, it appears that material issues of fact remain for trial on the plaintiffs'/appellants' claim of mutual mistake in the transfer of the Green Road property.

5. *Standing.* Finally, based on the record before us, it does not appear that the trial court erred in concluding that Ledford, O'Dell, and Walker satisfied the requirements of OCGA § 14-11-801 and thus have standing to bring a derivative action on behalf of SLC for the reconveyance of the Green Road property. Dyna-Vision, however, which has no ownership interest in SLC or the Green Road property, lacks standing to sue for the property's return. See *Golden Plaza v. Richmond County,* 232 Ga. App. 576, 578 (502 SE2d 321) (1998). The trial court should have granted summary judgment to the defendants/cross-appellants on any claims Dyna-Vision made with respect to the reconveyance of the Green Road property.

Further, the defendants'/cross-appellants' assertion that the plaintiffs lacked standing "for claims relating to the Put/Call" are moot given our holdings in Divisions 1 and 2, supra. We also note that the defendants/cross-appellants failed to present any legal argument in support of this claim of error. An assertion of error followed by a case citation is not legal argument. As we have explained, legal analysis "is, at a minimum, a discussion of the appropriate law as applied to the relevant facts." *Dixon v. MARTA,* 242 Ga. App. 262, 266 (4) (529 SE2d 398) (2000).

6. The defendants'/cross-appellants' motion to dismiss this appeal based upon the plaintiffs'/appellants' failure to abide by Court of Appeals Rules respecting the form and content of appellate briefs is dismissed as moot.

*Judgment affirmed in part and reversed in part, and case remanded. Smith, P. J., and Adams, J., concur.*

DECIDED JULY 12, 2005 —
RECONSIDERATIONS DENIED JULY 28, 2005 — 

*Bondurant, Mixson & Elmore, H. Lamar Mixson, David G. H. Brackett, Horace G. Joiner, Jr.*, for appellants.
*Krevolin & Horst, Jeffrey D. Horst, Joann Brown-Williams*, for appellees.