[PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-13738

_____

HEE JIN LOWERY,
JOHN LOWERY,
Individually, and as assignees of Shou &
Shou, Inc.,

                              Plaintiffs-Counter Defendants-Appellees,

*versus*

AMGUARD INSURANCE COMPANY,

                              Defendant-Counter Claimant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:20-cv-05148-TWT

_____

Before WILLIAM PRYOR, Chief Judge, ABUDU, Circuit Judge, and BARBER,[*] District Judge.

WILLIAM PRYOR, Chief Judge:

We *sua sponte* vacate our original opinion and substitute in its place the following opinion.

This appeal presents a jurisdictional issue that we must address before we can resolve the merits of equitable reformation of an insurance policy under Georgia law. After Gina Lowery sustained serious injuries from a hot-soup spill at Noodle College Park, an Atlanta-area restaurant, she and her spouse sued Shou & Shou, Inc., which owned and operated the restaurant. Shou & Shou tendered the defense to and sought coverage from AmGuard Insurance Company. But AmGuard denied coverage on the ground that the policy named "Noodle, Inc."—an entity that did not exist—as insured. Shou & Shou settled the suit and assigned the Lowerys its rights under the policy. The Lowerys, as assignees, then sued AmGuard for equitable reformation of the policy. The district court granted partial summary judgment in favor of the Lowerys and later entered a final judgment. We have jurisdiction to review that judgment because the Lowerys implicitly moved for, and the district court implicitly allowed, an amendment of the complaint.

_____

[*] Honorable Thomas P. Barber, United States District Judge for the Middle District of Florida, sitting by designation.

And because reformation of the policy was proper under Georgia law, we affirm.

## I. BACKGROUND

Shou & Shou, Inc., owned several restaurants in the Atlanta area under the trade name "Noodle." One restaurant was located on Main Street in College Park. In 2013, the Shou siblings, who owned the company, bought businessowner's insurance and workers' compensation insurance from AmGuard Insurance Company. The businessowner's policy named "Noodle, Inc." as the insured and listed its address as 3693 Main Street in College Park. The policy listed three locations at which Shou & Shou operated restaurants. Location 001 was 3693 Main Street in College Park—Noodle College Park. The workers' compensation policy was also issued to "Noodle, Inc." But the Shous never had any ownership interest in an entity by that name. Noodle, Inc. was not a corporation at all; "Noodle, Inc." was "merely a reference to the tradename" of the Noodle restaurants.

The Shous renewed the businessowner's policy through the 2018–19 policy period. Each renewal retained the same name, mailing address, and Location 001 for the insured. Shou & Shou paid all policy premiums from its operating account. In 2014, AmGuard learned during an audit of the workers' compensation policy that Shou & Shou was doing business as "Noodle" at the insured locations. AmGuard accordingly added Shou & Shou to the workers' compensation policy from its inception. But AmGuard never added Shou & Shou to the businessowner's policy.

AmGuard provided legal representation to Shou & Shou under the businessowner's policy despite the omission of its name. In 2016, Eled Addus sued several corporate and individual defendants in the Noodle chain—but *not* Shou & Shou—for injuries she allegedly sustained at Noodle College Park. The Shous tendered the defense to AmGuard, which accepted representation and appointed defense counsel. During that litigation, defense counsel informed AmGuard that Noodle College Park was "owned and operated by Shou & Shou, Inc." AmGuard gave defense counsel authority to substitute Shou & Shou as the proper defendant and to represent it. Defense counsel later told AmGuard again that its "insured is Shou & Shou, Inc. This company owns and operates [Noodle College Park]." Yet, when AmGuard issued the 2016–17 businessowner's policy later that year, it retained the same information for the insured, its address, and Location 001. AmGuard eventually settled the *Addus* suit by obtaining a release for Shou & Shou.

AmGuard also investigated a claim by Zuri Zahara Love for injuries she sustained at Noodle College Park during the 2016–17 policy's coverage period. Love sued multiple defendants in the Noodle network, including Shou & Shou. Shou & Shou again tendered the defense to AmGuard, which again accepted representation. The assigned defense counsel told AmGuard that the "company that owns [Noodle College Park] is Shou & Shou, Inc." Defense counsel filed an answer for Shou & Shou and moved to dismiss the other defendants as improper parties. AmGuard later settled the *Love* suit by obtaining a release for Shou & Shou.

This appeal arises from a third lawsuit. Gina Lowery bought soup at Noodle College Park during the effective dates of the 2016–17 policy. The soup seriously injured her when it spilled through its packaging into her lap. She and her husband sued Shou & Shou in state court and demanded damages for personal injuries. Shou & Shou tendered the defense to AmGuard. But this time, the insurance company denied coverage on the ground that "Shou and Shou Inc. is not a named insured" or "otherwise qualif[ied] as an insured under the policy." Shou & Shou reached a $1 million consent judgment with the Lowerys and assigned them its rights under the 2016–17 policy.

The Lowerys sued AmGuard in the district court based on diversity jurisdiction. 28 U.S.C. § 1332(a). Their amended complaint alleged three counts: count one for equitable reformation of the 2016–17 policy based on mutual mistake in not naming Shou & Shou as the insured owner of Noodle College Park; count two for breach of contract of the reformed 2016–17 policy; and count three for bad-faith refusal to defend and indemnify Shou & Shou. AmGuard filed a counterclaim seeking a declaration that Shou & Shou had no rights under the 2016–17 policy.

The parties moved for summary judgment following discovery. The Lowerys sought partial summary judgment on counts one and two of their complaint and against the counterclaim. The district court granted partial summary judgment in favor of the Lowerys. But that order did not resolve count three of the complaint.

After AmGuard asked the district court to certify its order for interlocutory review, *see* 28 U.S.C. § 1292(b), the Lowerys filed a "notice of intent to abandon" the bad-faith claim alleged in count three. The notice stated that the Lowerys had "elect[ed] to forego" the penalties and fees they were seeking in count three and were "abandon[ing]" that count. The Lowerys also filed a "request for final judgment" under Federal Rule of Civil Procedure 58(d). The request alleged that "[n]o further matters [we]re before the District Court for resolution" because the Lowerys had abandoned the only count not resolved by the partial summary judgment. The Lowerys asked that the partial summary judgment "be made the final judgment of the court." They argued that the district court should not certify an interlocutory appeal because the motion to certify would become moot when "final judgment [was] entered consistent with the Court's summary judgment order."

AmGuard filed a notice of non-opposition to the Lowerys' request for final judgment based on their abandonment of the remaining claim. The district court entered a "final order and judgment" the next day. It found that "no additional claims for adjudication remain[ed] pending." And it declared its order granting partial summary judgment the "final judgment of the Court."

This Court submitted jurisdictional questions to the parties. First, the Court asked whether the Lowerys' "notice of intent to abandon" count three effectively dismissed that claim of bad faith. Second, the Court asked whether the allegations in the pleadings satisfied the requirements of diversity jurisdiction.

The parties argued for jurisdiction in a joint response. They asked this Court to construe the Lowerys' notice of intent to abandon as a motion to amend their complaint to drop count three and to construe the final judgment as a grant of that motion. *See* FED. R. CIV. P. 15(a)(2). The jurisdictional panel agreed that the district court had diversity jurisdiction but carried the question whether count three had been resolved and whether the district court entered a final order. *See* 28 U.S.C. § 1291.

## II. STANDARDS OF REVIEW

We review our jurisdiction *de novo*. *Cavalieri v. Avior Airlines C.A.*, 25 F.4th 843, 848 (11th Cir. 2022). We also review *de novo* a summary judgment, drawing all inferences in the nonmoving party's favor and affirming only if there are no genuine issues of material fact. *Sutton v. Wal-Mart Stores E., LP*, 64 F.4th 1166, 1168 (11th Cir. 2023) (citation omitted). We may affirm on any ground the record supports. *Mata Chorwadi, Inc. v. City of Boynton Beach*, 66 F.4th 1259, 1263 (11th Cir. 2023).

## III. DISCUSSION

We divide our discussion into three parts. First, we explain why we have jurisdiction to hear this appeal. Next, we explain that the district court did not err by granting summary judgment in favor of the Lowerys on their claim for equitable reformation. Last, we explain that the district court did not err by granting summary judgment in favor of the Lowerys on their claim for breach of contract.

*A. We Have Jurisdiction Under Section 1291.*

Federal law grants us jurisdiction over appeals from "final decisions of the district courts." 28 U.S.C. § 1291. A decision ordinarily is "final" only when it adjudicates all claims of all parties to an action. *Corsello v. Lincare, Inc.*, 276 F.3d 1229, 1230 (11th Cir. 2001). The partial summary judgment did not resolve the bad-faith claim in count three. But the district court rendered that partial summary judgment "final" under Rules 54 and 58 after the Lowerys filed their notice to abandon count three.

We adopt the parties' proposed construction of the Lowerys' notice of intent to abandon and the final judgment: the Lowerys moved under Rule 15(a)(2) to amend their complaint to drop count three, and the district court granted that motion in declaring that no claims remained pending for adjudication. *See* FED. R. CIV. P. 15(a)(2) (allowing amendment with "the court's leave"). Rule 15 is the "most obvious" vehicle for "dismiss[ing] a single claim without dismissing an entire action"—which is exactly what the Lowerys wanted to do: they "did not wish to proceed to trial on" their "one single claim." *See Perry v. Schumacher Grp. of La.*, 891 F.3d 954, 958 (11th Cir. 2018). That the Lowerys did not style their notice a "motion" is not dispositive; we have suggested in a similar circumstance that we may "construe both the notice" and a responsive order "as being brought under Rule 15." *See Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1106 (11th Cir. 2004). The Lowerys also satisfied our Circuit law by "set[ting] forth the substance" of what we construe as their "proposed amendment"; they notified the district

court that they were electing to forego count three. *See Cita Tr. Co. AG v. Fifth Third Bank*, 879 F.3d 1151, 1157 (11th Cir. 2018). And the intent of the district court to grant the Lowerys leave to drop that count is apparent from the face of the final judgment. We have jurisdiction over this appeal. *See* 28 U.S.C. § 1291.

*B. The District Court Correctly Equitably Reformed the 2016–17 Policy to Insure the True Owner of the Restaurant.*

The Lowerys sought equitable reformation of the 2016–17 policy based on mutual mistake, which under Georgia law is "an action intended to 'do equity' among the interested parties by changing completed transactions to reflect true intentions." *Cherokee Nat. Life Ins. Co. v. Coastal Bank of Ga.*, 238 S.E.2d 866, 869 (Ga. 1977). A mistake of fact can be an "unintentional act, omission, or error" owing to "ignorance, surprise," or "misplaced confidence." GA. CODE § 23-2-21(a). A mutual mistake is one "shared by" the parties, *Ledford v. Smith*, 618 S.E.2d 627, 637 (Ga. Ct. App. 2005) (citation omitted), but the parties' mistakes need not be "exactly the same," *Bank of Am. v. Cuneo*, 770 S.E.2d 48, 54 (Ga. Ct. App. 2015). Georgia courts have defined mutual mistake at a high level of generality to accomplish the basic objective the parties set out to achieve. *See, e.g., Curry v. Curry*, 473 S.E.2d 760, 761 (Ga. 1996) (granting reformation when the parties to a deed intended to convey a home lot); *Occidental Fire & Cas. of N.C. v. Goodman*, 793 S.E.2d 606, 609 (Ga. Ct. App. 2016) (granting reformation when the parties intended to insure a restaurant and bar). Awareness of the correct name of the party seeking reformation is not necessary for the mistake to be common to both parties. *See Occidental*, 793 S.E.2d at 609.

Reformation is proper only when the party seeking it proves mutual mistake with "clear, unequivocal, and decisive" evidence. GA. CODE § 23-2-21(c). But the mistake need not be "admitted by both parties." *Ga. Farm Bureau Mut. Ins. Co. v. Wall*, 249 S.E.2d 588, 590–91 (Ga. 1978). A court can reform an instrument even if the opposing party asserts in an affidavit that it did not share the claimant's intent. *See Cuneo*, 770 S.E.2d at 54.

We focus our analysis on the 2016–17 policy, not the original 2013–14 contract. A claim for reformation arises when the parties "labored under the same misconception . . . at the time of the execution of the instrument." *Fox v. Washburn*, 449 S.E.2d 513, 514 (Ga. 1994) (citation and internal quotation marks omitted). The Lowerys correctly seek reformation of the 2016–17 policy because that was the policy in force when Lowery sustained her injury at Noodle College Park.

AmGuard cites *Infinity General Insurance Co. v. Litton* to support its argument that we should focus our analysis on the original policy, but AmGuard misreads that decision. 707 S.E.2d 885 (Ga. Ct. App. 2011). *Litton* never discussed equitable reformation. It stands only for the proposition that a policy is a "renewal," not a "new contract," when "its terms . . . carr[y] forward the same obligation[s]" as an earlier policy. *Id.* at 888–89. The parties do not dispute that the 2016–17 policy is, as it says on its face, a "[r]enewal" of the original policy. It does not follow that the 2016–17 policy is not the proper instrument for our analysis. The 2016–17 policy does not expressly "void" its predecessor policies. *See Brannen v.*

*Gulf Life Ins. Co.*, 410 S.E.2d 763, 764 (Ga. Ct. App. 1991) (finding that a "duplicate" policy was the proper instrument for the analysis of mistake when it "clearly and unequivocally" voided an earlier policy).

AmGuard also argues that the district court erred by considering events after the execution of the relevant policy, but we disagree. Courts may consult the parties' "subsequent conduct" as "evidence of their true intent." *First Chatham Bank v. Liberty Cap., LLC*, 755 S.E.2d 219, 224 (Ga. Ct. App. 2014). The "actual conduct of both parties" following contract formation is probative evidence of mutual mistake. *Fox*, 449 S.E.2d at 514.

A mutual mistake in naming the insured owner of a restaurant provides a basis for equitable reformation. In *Occidental*, a limited liability company bought a bar and restaurant business. *See* 793 S.E.2d at 608. The individual member of the company then signed a commercial insurance application for the restaurant that identified the restaurant and its *former* owner as the insured. *Id.* The member later accepted an insurance proposal listing the former owner as the insured. *Id.* Then the estate of a patron who had been stabbed to death in the restaurant sued the company for wrongful death. The company sought defense and indemnification under the policy. But the insurer denied coverage on the ground that the entity "was not listed as, and did not come within the definition of, an insured under the policy." *Id.* After the restaurant settled the suit and assigned its policy rights to the estate, the estate obtained a reformation of the policy. *Id.* The Georgia Court of Appeals held

that the insurer failed to explain why either party to the policy "would have intended for [it] to provide . . . coverage to the prior owner who no longer had any interest in the business, rather than the actual current owner." *Id.* at 609. The insurer "relied on" a mistaken application when it issued the policy and "labored under the same misconception that the name of the insured should be the prior corporate owner's name." *Id.*

*Occidental* controls this appeal. AmGuard insists that it could not have shared Shou & Shou's mistake because it did not know the "identit[y]" of the intended insured and could not have intended to "name" Shou & Shou as an insured. But Georgia law does not demand that degree of specificity in defining a mutual mistake. Nothing in *Occidental* suggests that the insurer knew or had reason to know the identity or name of the limited liability company. The mistake was that the insured should be an entity other than the true owner. And the mutual mistake here is identical: the 2016–17 policy insured a fictional entity with no insurable interest instead of the owner of the business that the policy was meant to insure, and the insurer reaped premiums even as the owner was denied coverage. As in *Occidental*, the parties could not have intended that outcome.

AmGuard argues that *Occidental* is "materially distinguishable" on three grounds, but each argument misses the mark. First, AmGuard contends that the 2016–17 policy was not issued to a prior owner of the insured business. But nothing in *Occidental* suggests the materiality of the fact that the mistaken insured was the *prior* owner of the bar and restaurant. What mattered was that the

mistaken insured was *not* the *"current* owner"—that is, the true owner. *Id*. at 609 (emphasis added). Second, AmGuard asserts that the policy *"did* provide coverage"—to "Noodle Life" and for "various propert[ies]" owned by the Shous—and so was "not issued to an entity with *no* insurable interest." But the record contains no evidence that the policy insured "Noodle Life." The original policy and the 2016–17 policy were both issued to "Noodle, Inc." And the parties agree that "Noodle, Inc. was not an actual corporation" during the coverage period and could have "no insurable interest." Third, AmGuard argues that because the Shous "own several entities," no evidence "suggest[s] that the parties would have intended to solely insure Shou & Shou as opposed to Noodle [Inc.]." On the contrary, no evidence refutes the Lowerys' consistent assertion that the Shous intended to insure the owner of Noodle College Park—Shou & Shou.

*Lee v. American Central Insurance Co.*, on which AmGuard relies, is inapposite. 530 S.E.2d 727 (Ga. Ct. App. 1999). The plaintiff in *Lee* sought reformation of an insurance policy to which he was not a party and that never mentioned his name. *Id*. at 729. The court of appeals explained that the insurer "was not informed" that the plaintiff owned the property, that the policy never mentioned the plaintiff, and that the plaintiff "did not conduct business" with the insurer "related to the policy." *Id*. at 730. AmGuard, in contrast, *was* informed that Shou & Shou owned Noodle College Park, and Shou & Shou *did* conduct business with AmGuard under the policy. AmGuard's appointed defense counsel in the *Addus* suit told AmGuard, "Your insured is Shou & Shou, Inc. This company owns and

operates [Noodle College Park]." Defense counsel in the *Love* suit told AmGuard substantially the same thing. Shou & Shou paid all premiums for the policy and its predecessor policies out of its operating account. AmGuard also settled the *Addus* and *Love* suits by obtaining releases in favor of Shou & Shou. And AmGuard, in evaluating policy renewal and premium rates for "Noodle, Inc.," considered prior claims it had handled for Shou & Shou at Noodle College Park.

Reformation of the policy does not prejudice AmGuard. Although AmGuard contends that reformation would be prejudicial because it would require insuring Shou & Shou, an entity it "never agreed" or "intended" to insure, the same could be said of the insurer in *Occidental*. *See* 793 S.E.2d at 609. AmGuard also argues that the policy charged premiums reflecting the risks it judged "commensurate with insuring a single business entity" and that reforming the policy to "add" Shou & Shou would entail insuring "multiple entities." But the Lowerys seek only to substitute Shou & Shou for "Noodle, Inc.," a nonexistent entity; reformation would not change the "number of entities to be insured." And though AmGuard considers it "obviously prejudicial" to be "exposed" to the $1 million consent judgment in the Lowerys' state suit, the Georgia court rejected that argument in materially identical circumstances in *Occidental*, *see id.* Other Georgia courts too have rejected prejudice arguments grounded in financial loss when the contract is otherwise reformable. *See, e.g.*, *Brannen*, 410 S.E.2d at 763–65.

*C. The Lowerys' Claim of Breach of Contract*
*Merges with Reformation of the Policy.*

The district court also did not err by granting summary judgment in favor of the Lowerys on their claim of breach of contract. A claim for equitable reformation and a claim for damages flowing from breach of the reformed contract are "only one claim for relief." *Wall*, 249 S.E.2d at 590. Reformation relates back to the date of the policy's execution. *Aames Funding Corp. v. Henderson*, 620 S.E.2d 503, 506 (Ga. Ct. App. 2005). Because the district court correctly reformed the 2016–17 policy to substitute in Shou & Shou as the insured, the policy required AmGuard to defend and indemnify Shou & Shou in the Lowerys' state suit. *See Occidental*, 793 S.E.2d at 609.

## IV. CONCLUSION

We **AFFIRM** the judgment in favor of the Lowerys.