# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| NOVARUS CAPITAL HOLDINGS, LLC, a Delaware limited liability company, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | **C.A. No. 2020-0331-JRS** |
| AFG ME WEST HOLDINGS, LLC, a Georgia limited liability company, ATTICUS FRANCHISE GROUP ME, LLC, a Georgia limited liability company, AFG ME WEST, LLC, a Georgia limited liability company, and MICHAEL DRUM, an individual, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted:  March 18, 2021
Date Decided:  June 23, 2021

Kevin M. Coen, Esquire of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; Darrell G. Waas, Esquire and Patricia C. Campbell, Esquire of Waas Campbell Rivera Johnson & Velasquez LLP, Denver, Colorado, Attorneys for Plaintiff.

Alan D. Albert, Esquire of O'Hagan Meyer PLLC, Wilmington, Delaware, Attorney for Defendants.

**SLIGHTS, Vice Chancellor**

In 2005, Eric Kenealy and his wife became franchisees of Massage Envy, a massage and skin care retail chain. Twelve years later, the Kenealys formed Plaintiff, Novarus Capital Holdings, LLC ("Novarus"), to act as an entity through which they would acquire additional Massage Envy clinics. By April 2019, the Kenealys, either individually or through Novarus, owned and operated 18 successful Massage Envy locations employing more than 500 employees.

In recognition of the couple's success, Massage Envy Franchising, LLC (the "Franchisor") offered Novarus the opportunity to enter into an agreement that would provide it preferential access to Massage Envy franchises for sale in designated territories (the "Consolidator Agreement"). The parties entered a non-binding term sheet (the "Term Sheet") describing the transaction in January 2019, contemplating a yet-to-be-executed development agreement. With the expansion of its business as outlined in the Term Sheet in mind, and with the encouragement of the Franchisor, Novarus decided to partner with a private equity firm that could provide the capital necessary to facilitate the anticipated growth of the business.

After a bidding process, Defendants, Atticus Franchise Group ME, LLC ("Atticus") and its managing member, Michael Drum, emerged as Novarus' preferred partner, based in part on various alleged extracontractual representations made by Drum. The parties memorialized their bargain in a Membership Interest Purchase Agreement ("MIPA") and Amended and Restated LLC Agreement

1

(the "Operating Agreement" and, together with the MIPA, the "Agreements") of the newly-formed entity, Defendant, AFG ME West Holdings, LLC (the "Company"). The Company acquired, among other assets, eighteen of the Kenealys' Massage Envy clinics, including those held by Novarus. In exchange, Novarus received approximately $16 million cash consideration and a 20% ownership interest in the Company, with the remaining 80% held by Defendant, AFG ME West, LLC ("AFG LLC"), of which Drum was the managing member.

As stated in the Operating Agreement, Atticus was designated as the Manager of the Company and permitted to draw compensation for that role up to 10% of the Company's "gross operating revenue" per year. The Agreements both contained merger clauses providing that the written contract represented the entire agreement between the parties, and both designated Georgia law to apply to disputes arising out of the contracts.

Soon after its execution, Novarus realized the Operating Agreement capped Atticus' management fee by reference to "gross" operating revenue when the parties had intended to cap its fees at "net" operating revenue. Novarus informed Atticus of the mutual mistake, but Atticus refused to agree to modify the executed Operating Agreement and continued to draw its management fee at 10% of gross operating revenue. Atticus also began to ice out the Company from acquisitions of other Massage Envy clinics. Novarus' complaint in this action followed.

2

The operative complaint asserts six Counts. First, Novarus brings a claim against the Company and AFG LLC to reform the Operating Agreement to reflect the parties' intent that Atticus' management fees would be capped at 10% of the Company's "net" (as opposed to "gross") operating revenue, relying principally on contemporaneous emails between counsel to demonstrate the existence of a mutual mistake. Second, Novarus seeks a declaratory judgment that clarifies the meaning of the term "net operating revenue" within the Operating Agreement, as Defendants have taken the position that "net" and "gross" operating revenue mean the same thing. Third, Novarus brings claims against Atticus for willful and intentional misconduct (the standard of conduct for the Manager stated in the Operating Agreement) by taking for itself corporate opportunities belonging to the Company and paying itself an excessive management fee. Fourth, Novarus asserts an unjust enrichment claim against Drum, who is not a party to the Operating Agreement but allegedly has been unjustly enriched by Atticus' collection of unauthorized management fees. Fifth, Novarus asserts that Drum is liable for intentional misrepresentations he made to induce Novarus to enter into the MIPA and the Operating Agreement. Finally, Novarus brings a claim against the Company for breach of the implied covenant of good faith and fair dealing by abusing its discretion when compensating Atticus.

Defendants together have moved to dismiss all counts under Chancery Rule 12(b)(6) for failure to state claims upon which relief may be granted. After carefully considering the motion, the result is a mixed bag. Novarus has well pled bases for reformation and that there exists an actual controversy between the parties regarding the meaning of the term "net operating revenue" within the Operating Agreement that cannot be resolved on the pleadings. Novarus has also well pled that Atticus violated its obligations under the Operating Agreement to refrain from willful misconduct when it paid itself management fees based on a knowingly inflated metric to which the parties did not agree. Those same well pled facts support Novarus' claim for breach of the implied covenant of good faith and fair dealing under Georgia law. But the Operating Agreement bars Plaintiff's corporate opportunity claim against Atticus. And, as to Drum, Georgia law does not support Plaintiff's contention that he can be held personally liable either for unjust enrichment or his alleged extracontractual misrepresentations given the Agreements' explicit merger clauses. My reasoning follows.

## I. BACKGROUND

I have drawn the facts from well-pled allegations in the Verified Second Amended Complaint (the "Complaint") and documents properly incorporated by

reference or integral to that pleading.[1]  On a motion to dismiss, I accept as true the Complaint's well-pled factual allegations and draw all reasonable inferences in Plaintiffs' favor.[2]

**A. Parties**

Plaintiff, Novarus, is a Delaware limited liability company, with its principal place of business in Denver, Colorado.[3]

Defendant, Atticus, is a Georgia limited liability company with its principal place of business in Atlanta, Georgia.[4]  Defendant, AFG LLC, is a Georgia limited liability company with its principal place of business also in Atlanta, Georgia.[5] Defendant, Drum, is the managing member of Atticus and AFG LLC.[6]

---

[1] *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) (noting that on a motion to dismiss, the Court may consider documents that are "incorporated by reference" or "integral" to the complaint).

[2] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002).

[3] D.I. 13 (Verified Second Am. Compl.) ("Compl.") ¶ 1.

[4] Compl. ¶ 4.

[5] Compl. ¶ 6.

[6] Compl. ¶ 8.

The Company is a Georgia limited liability company with its principal place of business in Atlanta, Georgia.[7] As specified in the MIPA, AFG, LLC owns 80% of the membership interests in the Company and Novarus owns the remaining 20%.[8]

## B. The Kenealys Form Novarus

In 2005, Eric Kenealy and his wife became franchisees of Massage Envy, a massage and skin care national franchisor.[9] Over the next 10 years, the Kenealys purchased the licenses for several new locations and acquired numerous existing Massage Envy franchises.[10] Each Massage Envy clinic was owned by a single member limited liability company, and managed by an entity known as Novarus Capital Group, Inc. (later changed to Novarus Capital Group, LLC).[11] The growth of the business necessitated additional management and more centralized operations.[12] With these considerations in mind, the Kenealys formed the holding

---

[7] Compl. ¶ 2.

[8] Compl. ¶ 11; *see also* Compl. Ex. G ("MIPA") § 1.1(b).

[9] Compl. ¶¶ 3, 14. Mr. Kenealy's wife is not identified by name in the Complaint or elsewhere in the record.

[10] Compl. ¶ 15.

[11] Compl. ¶ 17.

[12] Compl. ¶ 16.

company, Novarus, in 2017 to act as the entity through which future Massage Envy clinics would be acquired.[13]

By April 2019, the Kenealys, either individually or through Novarus or related entities, were the franchisees of 18 successful Massage Envy locations employing more than 500 employees.[14] Their success did not go unnoticed. In early 2019, the Franchisor offered Novarus the opportunity to enter into a so-called "Consolidator Agreement" that would provide Novarus several benefits not offered to all Massage Envy franchisees.[15] The Term Sheet describing the transaction was dated January 2019.[16] Although the Term Sheet was expressly non-binding and contemplated a yet-to-be-executed development agreement ("DA"), Massage Envy confirmed it would operate as if the Term Sheet was fully effective.[17]

As noted, Novarus enjoyed several benefits as a "Consolidator" under the Term Sheet.[18] For instance, it was given preferential consideration for the

---

[13] *Id.*

[14] Compl. ¶¶ 18–19.

[15] Compl. ¶ 20.

[16] *Id.*; Compl. Ex. C.

[17] Compl. ¶¶ 21–22, Ex. D; *see also* Compl., Ex. E (emails referencing the offers of right of first refusal where the Franchisor indicated, "I know we have not inked the DA, but I will operate as if we have by showing you deals in your area."); *id.* (correspondence from the Franchisor stating it "definitely plan[ned] to follow" the Term Sheet).

[18] *See* Compl. ¶¶ 23–27.

7

acquisition of Massage Envy franchises offered for sale in the consolidated territory, which included Colorado, Utah, Idaho, Wyoming, Montana, New Mexico, Oklahoma and Las Vegas, Nevada.[19] Specifically, it was granted a "right of first refusal" to purchase any existing Massage Envy locations that were for sale in the territory, as well as the exclusive first right to acquire any new locations in the territory that were offered for sale.[20]

The Term Sheet included a schedule that contemplated the acquisition and development of 17 Massage Envy clinics within the first two years of the five-year agreement, and 50–70 locations by the term's end.[21] To facilitate its growth, Novarus was encouraged by the Franchisor to partner with a private equity firm that could provide the necessary capital.[22] To this end, Novarus determined it would seek an investor willing to acquire a majority interest in the Massage Envy franchises owned by Novarus and its related companies.[23]

---

[19] Compl. ¶ 23. After two years, the territory was to be expanded to include Iowa, Nebraska, Kansas, Missouri and Minneapolis, Minnesota. *Id.*

[20] Compl. ¶ 24; *see also* Compl., Ex. E.

[21] *See* Compl., Ex. C.

[22] Compl. ¶ 28.

[23] Compl. ¶ 29.

## C. Novarus Chooses to Partner with Atticus

Novarus retained an investment banker and received significant interest in the business, including from Atticus, a Massage Envy Consolidator in the southeast United States.[24] Atticus' interest in Novarus, obviously, was enhanced by the substantial upside reflected in the Term Sheet;[25] Novarus' interest in Atticus flowed from its managing member, Drum's, express and repeated representations that Atticus had the requisite capital and experience to grow the business.[26] Novarus was also attracted to Atticus by Drum's repeated representations that Atticus would follow the comprehensive business and growth plan prepared by Novarus to exploit the benefits of the Term Sheet.[27]

As Novarus searched for an investment partner, it evaluated whether to exercise its right of first refusal for certain Massage Envy clinics in Utah.[28] Because Atticus was then the top contender to acquire Novarus' interests, Kenealy conferred with Drum and other Atticus representatives when deciding whether to exercise his

---

[24] Compl. ¶¶ 30, 32–33.

[25] Compl. ¶ 37.

[26] Compl. ¶ 31.

[27] Compl. ¶¶ 34–36, Ex. F (investment presentation made by Novarus to Atticus describing Novarus' consolidator relationship with the Franchisor and Novarus' growth plan).

[28] Compl. ¶ 38.

first refusal rights.[29] Atticus and Novarus worked together to analyze the opportunity and Atticus encouraged Novarus to exercise its right of first refusal.[30] Prior to closing with Atticus, Massage Envy offered several additional opportunities to Novarus, including for clinics in Minnesota and Utah.[31]

In addition to the opportunities identified in the Term Sheet, Novarus had previously negotiated agreements to acquire seven Massage Envy clinics in Colorado.[32] Because the closing with Atticus was imminent, the parties agreed that Atticus would finalize the Colorado acquisitions, and the clinics would then be put into the to-be-formed Company.[33]

## D. The Parties Negotiate and Execute the Agreements

On April 5, 2019, the purchase and sale transaction was memorialized in an MIPA.[34] The Company acquired 18 franchised Massage Envy clinics from Novarus Capital Group, LLC, and other Novarus-related entities.[35] As part of that

---

[29] *Id.*

[30] Compl. ¶ 39.

[31] Compl. ¶ 40.

[32] Compl. ¶ 76.

[33] Compl. ¶¶ 76, 78.

[34] Compl. ¶ 42; MIPA.

[35] Compl. ¶ 41.

transaction, and as partial consideration for the sale, Novarus obtained its 20% ownership interest in the Company, and AFG LLC's ownership interest was reduced from 100% to 80%.[36] Novarus also received roughly $16 million in cash consideration.[37]

Novarus alleges Drum made several oral representations to Novarus to induce Novarus to sell to Atticus, including:

- The Company would maintain Novarus and Novarus Capital Group, LLC as separate entities with separate ongoing operations;
- Novarus and Novarus Capital Group, LLC employees would be retained;
- The Novarus corporate office in Colorado would remain open;
- The leases for the Massage Envy clinics entered into by Novarus or related entities would be assumed by the Company, and the Company would continue to pay all rents owed;
- New Massage Envy clinics that became available under Novarus' Term Sheet would be acquired by the Company;
- The new clinics would be purchased with a combination of third-party financing and cash;
- Atticus and its principals had the financial capability to obtain such third-party financing;
- The Company would continue to grow by following the business plan and the growth plan in the Term Sheet and acquiring new clinics in the Company's name;
- Because the new clinics would be acquired by the Company, Novarus would receive its share of any profits derived from the new business; and

---

[36] *Id.*; MIPA § 1.1.

[37] *See* MIPA § 1.2(a) (providing for payment to Novarus of $16,590,300.27 less certain expenses). At oral argument, Defendants' counsel suggested (and Plaintiff's counsel did not dispute) that Plaintiff netted about $12 million. *See* D.I. 39 (Tr. of the Oral Arg. on Defs.' Mot. to Dismiss) ("Oral Arg. Tr.") 11:1–4.

- Kenealy would become a member of the Company's Board of Directors and would be offered the position of Chairman of the Board.[38]

As discussed below, the deal the parties ultimately struck, as memorialized in the Agreements, was not so generous to Novarus.[39]

The Operating Agreement, at Section 8.06, contemplated that Atticus would act as Manager and would be paid a management fee.[40] On the day before the Operating Agreement was executed, April 4, 2019, counsel for the parties had an email exchange that is prominently featured in Novarus' claims. As the parties were winding up their negotiations of the Operating Agreement, counsel for Novarus sent an email to counsel for Atticus, David Weinstein, confirming that the Operating Agreement was ready for execution with one exception: "On Section 8.06 we had agreed to a cap of 10% of net operating revenue [as the basis for the management fee] rather than 10% of gross operating revenue. If you can make that one change, we are final on the Operating Agreement."[41] Weinstein responded in an email stating, "[s]ee attached clean version, please confirm and we will circulate for

---

[38] Compl. ¶ 43.

[39] *See generally* Compl. Ex. B ("Operating Agreement"); *see also* Compl. ¶ 49.

[40] Operating Agreement § 8.06(a).

[41] Compl., Ex. H.

execution."[42]   The attached "clean version" conformed with Novarus' counsel's request, describing the management fee as "up to 10% of *net* operating revenue."[43]

And yet, unbeknownst to Novarus, the Operating Agreement executed on April 5, 2019, did not conform to the "clean version" circulated the day before.[44] Rather, Section 8.06 of the executed Operating Agreement provides in relevant part:

> (a) The Manager shall be compensated for its services as the Manager, and the Company shall pay to the Manager (or its Affiliate, as designated by the Manager) compensation up to ten percent (10%) of the Company's **gross operating revenue** per year, which shall be paid by the company monthly in arrears. . . .[45]

The term "gross operating revenue" is not defined in the Operating Agreement, nor is there any mention of gross operating revenue anywhere in the Operating Agreement other than Section 8.06.[46]

Novarus noticed the error only after the Operating Agreement was signed, in the midst of an investigation prompted by its concern that Atticus was drawing

---

[42] *Id.*

[43] *Id.* § 8.06(a) (emphasis added); Compl. ¶ 51.

[44] Compl. ¶ 53.  It is unclear when the Company, Atticus, AFG, LLC or Drum first became aware that the wrong term was included in the final draft of the Operating Agreement. Compl. ¶ 57.  At the very latest, they became aware at the time they were notified by Novarus. *Id.*

[45] Operating Agreement § 8.06(a) (emphasis added).

[46] *See generally* Operating Agreement; Compl. ¶¶ 46–48.   I note that the term "net operating revenue" is similarly undefined in the Operating Agreement.

13

excessive management fees from the Company.[47]  Novarus notified Atticus upon its discovery of the error, but Defendants refused to reform the Operating Agreement.[48] The Company has continued to pay Atticus management fees based on 10% of the Company's *gross* operating revenue, a sum Plaintiff alleges well exceeds 10% of *net* operating revenue.[49]

The Operating Agreement delineates the corporate opportunities preserved for the Company.  Specifically, Sections 8.05 and 13.01 provide, respectively:

> **Section 8.05 Business Opportunities; Obligation to Not Compete**
> (a) Nothing contained in this Agreement shall prevent AFG, or any of its Affiliates from engaging in any other activities or businesses, regardless of whether those activities or businesses are similar to or competitive with the Business. Neither AFG nor any of its Affiliates shall be obligated to account to the Company or to the other Member for any profits or income earned or derived from other such activities or businesses. Neither AFG nor its Affiliates shall be obligated to inform the Company or the other Member of any business opportunity of any type or description.[50]

---

[47] Compl. ¶ 54.

[48] Compl. ¶¶ 56–58.

[49] Compl. ¶¶ 58–59, 61.  Defendants have sought to introduce into the record, along with the declaration of Bill Gmaz, several spreadsheets disputing Novarus' drawn distinction between "gross operating revenue" and "net operating revenue," but they admit that Gmaz's "declaration potentially lies outside the four corners of the [Complaint]" and acknowledge that "Defendants do not seek to have the Court consider it as substantive, extrinsic evidence for the purposes of this motion . . . ." Defs.' Opening Br. at 17–18.  The spreadsheets' veracity is also contested, as Novarus affirmatively pleads (and proffers proof) that these spreadsheets are inaccurate.  Compl. ¶¶ 61–64, Ex. I.  At this stage, I cannot credit Gmaz's declaration or the spreadsheets as evidence to controvert Novarus' pled facts.

[50] Operating Agreement § 8.05.

**Section 13.01 Other Business Activities.** The parties hereto expressly acknowledge and agree that: (i) AFG and its Affiliates are permitted to have, and may presently or in the future have, investments or other business relationships, ventures, agreements, or arrangements with entities engaged in the business of the Company, other than through the Company and the Company Subsidiaries ("**Other Business**"); (ii) AFG and its Affiliates have or may develop a strategic relationship with businesses that are or may be competitive with the Company and the Company Subsidiaries; (iii) none of AFG or its Affiliates will be prohibited by virtue of AFG's investment in the Company from pursuing and engaging in any such activities; (iv) none of AFG or its Affiliates will be obligated to inform the Company or Novarus or other Person of any such opportunity, relationship, or investment (a "**Company Opportunity**") or to present a Company Opportunity, and the Company hereby renounces any interest in a Company Opportunity and any expectancy that a Company Opportunity will be offered to it; (v) nothing contained herein shall limit, prohibit, or restrict any Board designee of AFG from serving on the board of directors or other governing body or committee of any Other Business; and (vi) Novarus will not acquire, be provided with an option or opportunity to acquire, or be entitled to any interest or participation in any Other Business as a result of the participation therein of any of AFG or its Affiliates. The parties hereto expressly authorize and consent to the involvement of AFG and/or its Affiliates in any Other Business. The parties hereto expressly waive, to the fullest extent permitted by Applicable Law, any rights to assert any claim that such involvement breaches any fiduciary or other duty or obligation owed to the Company or any Member or to assert that such involvement constitutes a conflict of interest by such Persons with respect to the Company or any Member.[51]

The Operating Agreement also identifies as a fully integrated document, superseding any and all agreements, understandings and representations other than

---

[51] *Id.* § 13.01.

those expressly set forth therein.[52] Section 14.06 contains an "Entire Agreement" provision, or merger clause, which states that:

> This Agreement . . . constitutes the sole and entire agreement of the parties to this Agreement . . . and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter, including the Original Agreement.[53]

Under Section 14.11 of the Operating Agreement, the parties agreed that disputes arising out of the Operating Agreement would be governed by Georgia law.[54]

### E. The "Partnership" Unravels

The discovery of the excessive management fees, and Atticus' refusal to agree to reform the Operating Agreement to reflect the parties' actual agreement, significantly diminished Novarus' enthusiasm for the partnership it thought it had formed with Atticus.[55] Trust was gone.[56] The relationship fractured altogether when Atticus and Drum failed to follow through on their extracontractual representations. For instance, Atticus and Drum represented that the Colorado clinics that Novarus had prospected would be acquired under the Company's name; instead, they were

---

[52] *Id.* § 13.7.

[53] *Id.* § 14.06.

[54] *Id.* § 14.11.

[55] Compl. ¶¶ 52, 56.

[56] *See id.*

placed into another entity affiliated with Drum and Atticus, thereby ensuring that Novarus received none of the profits.[57] Drum had also represented that future acquisitions under the Term Sheet would be funded by a combination of cash and third-party financing to which Atticus had ready access;[58] instead, Drum informed Novarus one week after closing that Atticus, the Company and/or its affiliates were in default with lenders, so the Company would need to fund the Utah acquisitions with cash, increasing Novarus' portion of the acquisition costs from approximately $106,000 to $532,000.[59] Atticus and Drum represented that the Utah clinics prospected by Novarus would be acquired by the Company; instead, they were acquired by an entity affiliated with Atticus, again depriving Novarus of any benefit from the acquisitions.[60]

Since forming the Company, new opportunities arising under the Term Sheet have not been acquired by the Company.[61] The final blow: the DA contemplated by

---

[57] Compl. ¶¶ 76–84.

[58] Compl. ¶ 92.

[59] Compl. ¶¶ 93–97.

[60] Compl. ¶¶ 95–97.

[61] Compl. ¶ 98.

the Term Sheet was ultimately signed by Massage Envy and an Atticus affiliate; the Company was shut out entirely.[62]

## F. Procedural History

On May 5, 2020, Plaintiff filed its initial complaint,[63] which was subsequently amended twice to comprise the now operative Complaint.[64] The Complaint asserts six causes of action.[65] Count I asserts a claim for reformation of the Operating Agreement, based on mutual mistake, to reflect the parties' agreement that the management fee paid to Atticus shall be based on "net operating revenue" instead of "gross operating revenue."[66] Count II seeks a declaratory judgment regarding the meaning of "net operating revenue" under the Operating Agreement.[67] Count III asserts a claim of willful and intentional misconduct against Atticus, incorporating standards of conduct stated in the Operating Agreement, for (a) allowing itself to be paid a management fee of 10% of the gross operating revenue after it learned of the parties' mistake and (b) acquiring the Colorado clinics through a separate entity not

---

[62] *Id.*

[63] D.I. 1.

[64] D.I. 13.

[65] Compl. ¶¶ 100–68.

[66] Compl. ¶¶ 101–11.

[67] Compl. ¶¶ 112–19.

18

associated with the Company (and, thus, Novarus), contrary to the terms of the Operating Agreement.[68] Count IV asserts a claim for unjust enrichment against Drum for allowing Atticus to collect a management fee of 10% gross operating revenue when he knew the parties had not agreed that Atticus could be paid on that basis.[69] Count V asserts a claim for intentional misrepresentation against Drum for his representations concerning future business growth and operations regarding the Company, which he is alleged to have known to be false.[70] Count VI asserts a claim against the Company for breach of the implied covenant of good faith and fair dealing for paying Atticus a management fee of 10% of gross operating revenue when it knew this was "contrary to the intent" of the Operating Agreement between the parties.[71]

---

[68] Compl. ¶¶ 76–84, 120–35.

[69] Compl. ¶¶ 136–46.

[70] Compl. ¶¶ 147–55.

[71] Compl. ¶¶ 156–68.

Defendants together moved to dismiss the Complaint on August 27, 2020.[72] After briefing, oral argument and supplemental briefing, the motion was submitted for decision on March 18, 2021.[73]

## II. ANALYSIS

The parties agree that, under Section 14.11 of the Operating Agreement, Georgia's substantive law applies to both contract claims and tort claims arising out of that contract, and they appear to acknowledge that Delaware's procedural law governs the Court's standard of review.[74] On a motion to dismiss brought under Court of Chancery Rule 12(b)(6), the court must:

---

[72] D.I. 16 (Defs.' AFG ME W. Hldgs., LLC, Atticus Franchise Gp. ME, LLC, AFG ME W., LLC and Michael Drum's Joint Mot. to Dismiss Pl.'s Verified Second Am. Compl.) ("Defs.' Opening Br.").

[73] D.I. 23 (Pl. Novarus Cap. Hldgs., LLC's Br. in Opp'n to Defs.' Mot. to Dismiss Pl.'s Verified Second Am. Compl.) ("Pl.'s Answering Br."); D.I. 25 (Defs.' AFG ME W. Hldgs., LLC, Atticus Franchise Gp. ME, LLC, AFG ME W., LLC and Michael Drum's Joint Reply Br. in Supp. of Mot. to Dismiss Pl.'s Verified Second Am. Compl.) ("Defs.' Reply Br."); D.I. 39 (Oral Arg. Tr.); D.I. 36 (Supp. Letter Br. of Defs.' AFG ME W. Hldgs., LLC, Atticus Franchise Gp. ME, LLC, AFG ME W., LLC and Michael Drum) ("Defs.' Supp. Br."); D.I. 37 (Supp. Letter Br. of Pl. Novarus Cap. Hldgs., LLC) ("Pl.'s Supp. Br.").

[74] *See* Defs.' Opening Br. at 15–39 (arguing for dismissal of all counts on the basis of substantive Georgia law while equivocating on the applicable procedural law); Pl.'s Answering Br. at 17–42 (arguing for denial of Defendants' motion to dismiss on all counts on the basis of substantive Georgia law and Delaware procedural law); Defs.' Reply Br. (taking no issue with Plaintiff's argument that Delaware procedural law applies); *see also* Operating Agreement § 14.11; *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1048 (Del. Ch. 2006) ("Parties operating in interstate and international commerce seek, by a choice of law provision, certainty as to the rules that govern their relationship. To hold that their choice is only effective as to the determination of contract claims, but not as to tort claims seeking to rescind the contract on grounds of misrepresentation, would create uncertainty of precisely the kind that the parties' choice of law provision sought to avoid.");

(1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as 'well pleaded' if they give the opposing party notice of the claim, (3) draw all reasonable inferences in favor of the non-moving party, and (4) [not dismiss the claims] unless plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[75]

Dismissal is warranted only where a plaintiff fails to plead facts supporting an element of their claim, or if "it appears with reasonable certainty that, under any set of facts that could be proven to support the claims asserted, the plaintiffs would not be entitled to relief."[76] In opposing Defendants' dismissal motions, Novarus is owed every reasonable factual inference in its favor.[77]

## A. Reformation (Count I)

In Count I, Plaintiff seeks to reform Section 8.06 of the Operating Agreement to cap the Company's Manager's management fees at 10% of "net" (as opposed to

---

*Tumlinson v. Advanced Micro Devices, Inc.*, 81 A.3d 1264, 1270 (Del. 2013) (reiterating Delaware law that trial courts are to apply Delaware procedural law even if another state's substantive law governs the dispute). For what it is worth, neither party argues there are relevant differences between Georgia and Delaware procedural law.

[75] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011) (citation omitted). I note at the outset that Defendants at no point argued that any of Novarus' claims are derivative (as opposed to direct) and so I assume for purposes of this motion that Rule 12(b)(6), not Rule 23.1, sets the applicable standard and that Novarus need not have pled demand futility. *See Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[76] *McMullin v. Beran*, 765 A.2d 910, 916 (Del. 2000) (quotation omitted).

[77] *In re Trados Inc. S'holder Litig.*, 2009 WL 2225958, at *7 n.36, 38 (Del. Ch. July 24, 2009).

"gross") operating revenue. Reformation is an equitable remedy by which the court may correct an instrument so that it expresses the true intent of the parties when, whether by fraud, accident or mistake, the instrument as executed does not express that intent by its terms.[78] The doctrine is grounded in the notion that a contracting party should not benefit from a windfall for which it did not bargain.[79]

Under Georgia law, "[a] petition for reformation of a written contract will lie where[,] by mistake of the scrivener and by oversight of the parties, the writing does not embody or fully express the real contract of the parties. The cause of the defect is immaterial so long as the mistake is common to both parties to the transaction."[80] A "mistake" is defined by statute to be "some unintentional act, omission or error arising from ignorance, surprise, imposition or misplaced confidence."[81] "[T]he negligence of the complaining party will not defeat his right to reformation if the other party has not been prejudiced."[82]

---

[78] *See* O.C.G.A. § 23-2-24 ("In all cases of mistake of fact material to the contract or other matter affected by it, if the complaining party applies within a reasonable time, equity will grant relief."); *see also Ledford v. Smith*, 618 S.E.2d 627, 638 (Ga. App. 2005) (applying the statute).

[79] *Occidental Fire & Cas. of N. Carolina v. Goodman*, 793 S.E.2d 606, 609 (Ga. App. 2016) (citations omitted).

[80] *Curry v. Curry*, 473 S.E.2d 760, 761 (Ga. 1996).

[81] O.C.G.A. § 23-2-21(a); *Ledford*, 618 S.E.2d at 637 (applying statutory definition of "mistake").

[82] *Occidental Fire*, 793 S.E.2d at 609.

Where, as here, the mistake is alleged to be mutual, both parties "must have labored under the same misconception" with respect to "the terms and conditions of a written instrument, intending at the time of the execution of the instrument to say one thing and by mistake expressing another," leaving the instrument's express terms disconnected from either party's intent.[83]  In the context of evaluating a claim for reformation, the parole evidence rule does not bar the court from receiving and considering extrinsic evidence of the parties' intent.[84]

On April 4, 2019—one day before the Operating Agreement was signed—Novarus' counsel sent an email to Atticus' counsel stating that the Operating Agreement was ready to execute with one exception: "On Section 8.06, we had agreed to a cap of 10% of net operating revenue rather than 10% of gross operating revenue.  If you can make that one change we are final on the Operating Agreement."[85]  Atticus' counsel agreed with the correction, made it, and then reverted the document in an email stating, "[s]ee attached clean version, please

---

[83] *Ledford*, 618 S.E.2d at 637 (quoting *Yeazel v. Burger King Corp.*, 526 S.E.2d 112, 116 (Ga. App. 1999)).

[84] *See Yeazel*, 526 S.E.2d at 117; *see also Ledford,* 618 S.E.2d at 638 (noting that "there is no rule that reformation will be denied unless the mistake [is] admitted by both parties." (internal citations and quotations omitted)).

[85] Compl. ¶ 50, Ex. H.

confirm and we will circulate for execution."[86]   But the executed Operating Agreement did not reflect the requested change to "net operating revenue" in what Novarus alleges was clear error.  This email exchange, where Atticus' counsel appears to agree with Novarus' counsel's characterization of the agreed upon term, suffices to allow an inference that the parties labored under a mutual mistake when they signed the Operating Agreement.[87]

According to Defendants, even if Novarus has well pled a mutual mistake, reformation still is not warranted under Georgia law because Novarus has failed to articulate a meaningful difference between "gross operating revenue" and "net operating revenue" and, therefore, any mutual mistake does not operate "as a gross injustice to one [while] giv[ing] an unconscionable advantage to the other."[88] Indeed, Novarus' reformation claim must fail, Defendants say, because there are no

---

[86] *Id.*

[87] *See* Compl. ¶¶ 50–51.  Defendants quote *Lawton v. Byck* to argue that Novarus has failed to "state why the terms of the actual contract happened to be left out, or how the terms not agreed on came to be inserted."  Defs.' Opening Br. at 15 (quoting *Lawton*, 217 Ga. 676, 682 (1962)).  But the excerpt of the quote from *Lawton* on which Defendants rely is not complete.  The court went on to clarify, "[i]n other words," "[i]f mistake is relied on, it must be distinctly charged and stated with precision, the particular mistake being shown, and how it occurred."  *Id.*  The email exchange in Exhibit H details the specific mistake with precision (i.e., failing to substitute net for gross operating revenue) and how it occurred (i.e., by mutual mistake, through counsels' failure to incorporate the corrected language in the executed contract).

[88] O.C.G.A. § 23-2-22.

allegations Atticus paid itself more than it was entitled to receive under Novarus' proffered reformation.

But Novarus affirmatively pleads that "net" and "gross" operating revenues are two distinct concepts, with the latter amounting to a higher management fee owing to Atticus than the former.[89] Further, the fact that Novarus' attorneys flagged the difference for Atticus' counsel, insisted on the change and obtained Atticus' agreement to the change, supports a reasonable inference that both parties understood the terms to have different meanings.[90] Conversely, Defendants' after-the-fact resistance to the revision suggests that they, too, see a meaningful difference between "net" and "gross." It is, therefore, reasonable to infer at this nascent stage of the litigation that "gross operating revenue" is greater than "net operating revenue" and, accordingly, Novarus has well pled it suffered harm when Atticus maxed out its management fees based on the former metric.[91] For these reasons, Defendants' motion to dismiss Count I is denied.

## B. Declaratory Judgment (Count II)

In Count II, Novarus seeks a judgment declaring that the Operating Agreement's undefined term "net operating revenue" should be understood to mean

---

[89] *See* Compl. ¶¶ 59–62.

[90] *See* Compl., Ex. H.

[91] Compl. ¶¶ 61–63, 67, 110.

"Net Income" as defined in the Operating Agreement.[92] "[T]he principal, salutary purpose of the declaratory judgment procedure is to provide a technique for early resolution of disputes where a party is suffering practical consequences from uncertainty arising from the assertion by another of a legal claim."[93] To obtain a declaratory judgment, there must be an "actual controversy," meaning:

> (1) It must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; and (4) the issue involved in the controversy must be ripe for judicial determination.[94]

"The court may refuse to render or enter a declaratory judgment or decree where such judgment or decree, if rendered or entered, will not terminate the uncertainty or controversy giving rise to the proceeding."[95]

Novarus asserts its declaratory judgment should survive dismissal because a controversy will exist as to the definition of "net operating revenue" if the Court

---

[92] *See* Operating Agreement Art. I at 8 (defining Net Income by reference to taxable income with enumerated adjustments).

[93] *Schick, Inc. v. Amalgamated Clothing & Textile Workers Union*, 533 A.2d 1235, 1241 (Del. Ch. 1987) (Allen, C.).

[94] *Id.* at 1238; *see also Strong v. JWM Hldgs., LLC*, 800 S.E.2d 380, 384–85 (Ga. App. 2017) ("Declaratory relief [] is inappropriate for controversies that are merely hypothetical, abstract, academic, or moot [and] declaratory judgment will not be rendered based on a possible or probable future contingency.").

[95] 10 *Del. C.* § 6506.

decides to reform the Operating Agreement but declines to define the reformed term. Defendants respond that, by stacking its request for declaratory relief on top of its yet-to-be-adjudicated reformation claim, Novarus has failed to present an actual "controversy" but, instead, has initiated "precisely the kind of effort to obtain an advisory opinion that courts will not act upon."[96]  In any event, say Defendants, the Court should dismiss the declaratory judgment count because the declaratory relief sought by Novarus—equating "net operating revenue" to "Net Income"—is so beyond the pale that it is not reasonably conceivable.  While Defendants conspicuously fail to cite any authoritative source defining the term "net operating revenue" at all, much less a source that defines it in a manner that reveals Novarus' proffered definition is inconceivable, they urge the Court, in essence, to take judicial notice of what Defendants cast as a well-understood term.

As an initial matter, Novarus' claim for declaratory judgment concerns an actual dispute.  Defendants have taken the position that "net operating revenue" means "gross operating revenue"; Novarus disagrees.  Thus, if the Court determines that reformation of the contract is justified, then a declaratory judgment as to the meaning of net operating revenue becomes necessary.[97]  The question for the Court

---

[96] Defs.' Reply Br. at 10.

[97] *See KLM Royal Dutch Airlines v. Checchi*, 698 A.2d 380, 383 (Del. Ch. 1997) (noting that "the declaratory judgment serves to promote preventive justice" and holding that the

at this juncture, then, is whether "net operating revenue" lends itself to a definition discernable on this record such that the prayer for declaratory relief is unnecessary because no controversy could reasonably exist.

Both parties agree that the Court may take judicial notice of certain external sources to determine the meaning of "net operating revenue."[98] "Whether requested by a party or not, a trial court may take judicial notice of 'a fact which is not subject to reasonable dispute,' in that it is '[c]apable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.'"[99] When interpreting contracts, "[w]ords generally bear their usual and common significance; but . . . words used in a particular trade or business will be construed, generally, to be in reference to this peculiar meaning."[100]

---

court may entertain a claim for declaratory relief that will be necessitated by its adjudication of a separate claim asserted in the same complaint).

[98] *See* Pl.'s Supp. Br. at 2–3; Defs.' Supp. Br. at 6–7.

[99] *Hunter v. Will*, 833 S.E.2d 128, 132 (Ga. App. 2019) (quoting O.C.G.A. § 24-2-201 (2014)). I note that this language is substantively similar to the judicial notice provisions of the Federal Rules of Evidence. *See* F.R.E. 201.

[100] O.C.G.A. § 13-2-2(a); *see also Rhodes v. Palmer*, 2004 WL 5295063 (Ga. Super. Apr. 26, 2004) (using the definition provided by a legal dictionary where "[t]he term 'transaction' does not appear to be used as a term particular to any business.").

The term "net operating revenue" does not appear in the Merriam-Webster dictionary. Nor does it appear in any Georgia statute or court rule.[101] Indeed, it does not even appear in the dictionary function on a website Defendants referenced as authoritative at oral argument—www.investopedia.com.[102] That website defines the terms "income," "net income," "net operating income," "operating revenue" and "revenue," but it makes no mention of the term "net operating revenue."[103] While the Court has identified some authority where the term is defined in various contexts, typically as some form of revenue less operating and maintenance costs, the contours of those costs as applied to the Company's business are too vague on this record to allow the Court to apply that definition, assuming the definition is even appropriate in the first place.[104]

---

[101] *See Shoffner v. Woodward*, 394 S.E.2d 921, 923–24 (Ga. App. 1990) (taking judicial notice of extant statutes to determine the meaning of "recapitalization").

[102] *See* Oral Arg. Tr. at 84:19–85:1.

[103] Investopedia, Financial Term Dictionary, https://www.investopedia.com/financial-term-dictionary-4769738 (last visited June 5, 2021).

[104] *See, e.g.*, Ind. C. Ann. § 16-22-7-3 (West) ("As used in this chapter, 'net operating revenue' means the revenues of the hospital, exclusive of any property tax levy remaining after provision for reasonable expenses of operation, repair, replacements, and maintenance of the hospital"); *Fidelity Nat. Bank v. Wood*, 375 S.E.2d 228, 229 (Ga. App. 1988) (equating "net operating revenues" of a commercial bus to gross revenue less expenses for fuel, oil and the driver, and distinguishing net operating revenues from profit because the latter concept "is found by reducing revenues by the amount of *all* expenses" of a then-indeterminable amount. (emphasis in original)); *San Diego Cty. Water Auth. v. Metro. Water Dist. of S. California*, 12 Cal. App. 5th 1124, 1143 (2017), *as modified on denial of reh'rg* (July 18, 2017) ("The bond contract promises repayment from net operating revenues, defined as 'all revenues received by [Metropolitan] from charges

To be sure, there is reason to be skeptical of Novarus' attempt to transmogrify a (top-line) revenue concept into a (bottom-line) income concept. Nonetheless, I cannot on this record surmise the definition of "net operating revenue" with sufficient precision to determine, as a matter of law, its meaning. Thus, I am satisfied Novarus has stated a valid claim for declaratory judgment. Accordingly, Defendants' motion to dismiss Count II is denied.

## C. Willful Misconduct (Count III)

In Count III, Novarus asserts that Atticus is liable for willful misconduct, having violated the standards of conduct prescribed for the Manager in the Operating Agreement.[105] Under Georgia law, willful misconduct "is conduct such as to evidence a willful intention to inflict the injury, or else was so reckless or so charged with indifference to the consequences . . . as to justify the jury in finding a

---

for the sale or availability of water' less operation and maintenance expenses."); *W&T Energy VI, LLC v. Dauphin Island Gathering P'rs*, 2016 WL 7406748, at \*6 (S.D. Tex. Dec. 22, 2016) (reviewing a contract defining "Net Operating Revenue" as "the gross revenue received by [a gas company] for handling such Third Party Gas less all direct operating and maintenance costs associated with the handling of such Third Party Gas, excepting the one cent ($0.01) per MMBtu fee set out in Section 6.6.").

[105] Under the Operating Agreement, Atticus is liable for conduct constituting willful misconduct or fraud. Operating Agreement §§ 12.01, 12.02.

wantonness equivalent in spirit to actual intent."[106]  It must be "based on an actual intention to do harm or inflict injury" upon another.[107]

Novarus proffers two distinct factual predicates for its claim of willful misconduct against Atticus.  First, Novarus alleges Atticus paid itself a management fee of 10% of the gross operating revenue after the mutually-understood error was brought to its attention, knowing full well that it was not entitled to the enhanced fees.[108]  Defendants counter that they cannot have engaged in willful misconduct by paying themselves 10% of gross operating revenue because they have complied with the letter of the Operating Agreement.  But O.C.G.A. § 14-11-305(4)(A) contemplates *two* ways in which a manager's liability cannot be eliminated: "(i) For intentional misconduct or a knowing violation of law; or (ii) [f]or any transaction for which the person received a personal benefit in violation or breach of any provision of a written operating agreement."[109]  By disjoining the first and second romanette, the statute's plain terms make clear a willful misconduct claim need not be tethered to a contractual provision.  Because I have determined Novarus' reformation claim

---

[106] *Martin v. Gaither*, 466 S.E.2d 621, 625 (Ga. App. 1995).

[107] *2010-1 SFG Venture LLC v. Lee Bank & Trust Co.*, 775 S.E.2d 243, 251 (Ga. App. 2015).

[108] Compl. ¶¶ 123–27.

[109] O.C.G.A. § 14-11-305(4)(A).

is well-founded, and because Novarus has alleged Atticus continued to charge the Company excessive management fees even after it was alerted to the mistake, it is reasonable to infer that Atticus willfully caused harm to Novarus by overdrawing funds from the Company in disregard of what it knew to be the parties' actual understanding. Defendants' motion to dismiss Novarus' willful misconduct claim for overdrawing management fees must therefore be denied.

Second, Novarus alleges that Atticus engaged in willful misconduct by causing the new clinics and opportunities under Novarus' Letters of Intent and the Term Sheet to be acquired by entities other than the Company. The MIPA details the transaction giving rise to the new entity and Novarus does not contest that the MIPA fails to carve out for that entity any rights to future business opportunities as alleged in Count III.[110] Novarus is thus left to rely on the Operating Agreement for some basis upon which the Court might infer that Atticus' actions constituted willful misconduct.

The provision of the Operating Agreement to which Novarus points is Section 13.01, where the parties agreed, "AFG and its Affiliates . . . may presently or in the future have, investments or other business relationships, ventures, agreements, or arrangements with entities engaged in the business of the Company,

---

[110] *See* Oral Arg. Tr. at 64:23–65:4.

32

other than through the Company and the Company Subsidiaries ("Other Business") . . . ."[111]  Novarus argues this language reveals that AFG and its affiliates could not exploit opportunities presented "through the Company."

But the plain text of Section 13.01 states that Atticus is free to invest in competing businesses through entities "other than [] the Company and the Company Subsidiaries"; and no specific opportunities are identified by either the Operating Agreement or the MIPA, let alone preserved for the Company.  If the parties had intended to carve out then-identified opportunities, they could have done so expressly.  They did not.  Instead, the parties agreed in Section 13.01 to give Defendants essentially unfettered discretion to pursue for themselves any corporate opportunity they wished.

Other provisions in the Operating Agreement confirm that Novarus' reading of Section 13.01 is unreasonable.  Section 8.05 states, "[n]othing contained in this Agreement shall prevent AFG, or any of its Affiliates from engaging in any other activities or businesses, regardless of whether those activities or businesses are similar to or competitive with the Business."[112]  That same provision makes clear that neither AFG nor its Affiliates were "obligated to inform the Company or the

---

[111] Operating Agreement § 13.01.

[112] *Id.* § 8.05(a).

other Member of any business opportunity of any type or description."[113]  Like Section 13.01 (and the MIPA), this provision contains no carveout language. Section 8.05's unqualified language conflicts with Novarus' construction of Section 13.05 as preserving certain corporate opportunities for the Company. In construing a contract under Georgia law, the court ascertains the parties' intentions by review of "the entire contract, considering each provision in connection with the others, and not giving the contract a construction which entirely neutralizes one provision if it is susceptible of another which gives effect to all its provisions."[114] Under fire of that canon, Novarus' reading of Section 13.01 cannot stand.

In a last gasp, Novarus contends that Defendants' construction of the Operating Agreement's corporate opportunity provisions makes no commercial sense because, had Novarus agreed to forego all future corporate opportunities, it would not have retained its 20% ownership position but would, instead, have sold out entirely for more consideration. Not so. The Agreements indicate that Novarus sold its 80% interest for a substantial cash payment, and then preserved a claim to 20% of future cash flows generated by the Company. While the parties allegedly

---

[113] *Id.*

[114] *White v. Kaminsky*, 610 S.E.2d 542, 545 (Ga. App. 2004); *see also* O.C.G.A. § 113-2-2(4) ("The construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part.").

discussed the possibility of together expanding the Company's operations, they expressly agreed this was not required.[115] Novarus cannot now come to the Court seeking relief under the Agreements when Defendants decided, in accordance with their contractual rights, to pursue opportunities for themselves.[116] Defendants' motion to dismiss Novarus' claim for willful misconduct based on alleged misappropriation of corporate opportunities, therefore, must be granted.

### D. Unjust Enrichment (Count IV)

In Count IV, Novarus alleges that Drum, despite his knowledge that there was an error in the Operating Agreement, intentionally caused Atticus to continue to collect a management fee of 10% of the Company's gross operating income. According to Novarus, the management fee collected by Atticus likely benefitted Drum personally and, given that he retained the benefit when he knew he was not entitled to it, he has been unjustly enriched at Novarus' expense.[117]

Unjust enrichment is, under Georgia law, an alternative theory of recovery if there is no contract claim.[118] A claim of unjust enrichment will lie only "if there is

---

[115] Operating Agreement §§ 8.05, 13.01.

[116] I note that Atticus offered to include Novarus in its Utah acquisitions, but Novarus declined. *See* Compl. ¶¶ 95–96.

[117] Compl. ¶¶ 129–43.

[118] *Wachovia Ins. Sers., Inc. v. Fallon*, 682 S.E.2d 657, 665 (Ga. App. 2009).

no legal contract and the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment which the benefited party equitably ought to return or compensate for."[119]

Under the contract at issue, Atticus—not Drum—was entitled to a management fee. Novarus has not alleged that Atticus assigned the contract to Drum or any other party. To the extent Atticus overdrew its management fee in breach of the Operating Agreement, Atticus will be held accountable to Novarus for that breach. As Novarus conceded at oral argument, this renders its claim against Drum duplicative.[120] For that reason, Defendants' motion to dismiss Count IV is granted.[121]

---

[119] *Vernon v. Assurance Forensic Acct.*, 774 S.E.2d 197, 212 (Ga. App. 2015).

[120] Oral Arg. Tr. at 61:11–14 ("If . . . Atticus is responsible for any excess amounts taken as management fees, then we don't need the unjust enrichment claims against Drum."). Relatedly, in *Peterson v. Aaron's Inc.*, the court dismissed a claim against a franchisor for harm allegedly inflicted by its franchisee because the contract with the franchisee governed the direct harm and the plaintiff could not employ the doctrine of unjust enrichment to sue a potential beneficiary. 2015 WL 5479877, at *2 (N.D. Ga. Sept. 16, 2015). In other words, the court literally applied the principle that "[t]he doctrine of unjust enrichment applies in the absence of a written contract between parties; where such a contract exists, however, it is the contract that governs the dispute and neither party can rely on unjust enrichment." *S-D RIRA, LLC v. Outback Prop. Owners' Assoc., Inc.*, S.E.2d 498, 507 (Ga. App. 2014). That reasoning applies with equal force here, as Drum is alleged to have only indirectly benefitted from Atticus' management fees.

[121] I note that Novarus has not argued that the Court should pierce the veil of either the Company or Atticus to reach Drum personally.

## E. Intentional Misrepresentation (Count V)

Novarus' fifth claim is for intentional misrepresentation (i.e., fraudulent inducement) against Drum.[122]  Specifically, Novarus alleges Drum orally represented that (1) Novarus and its affiliates would be maintained as separate entities with separate ongoing operations, including retaining all Novarus employees and keeping the corporate office in Colorado open; (2) the Company would assume the leases of Novarus' Massage Envy clinics and keep current with payments; and (3) any Massage Envy clinics that became available under the Novarus Term Sheet would be acquired by the Company, the acquisition(s) would be funded using a combination of cash and third-party financing (which Atticus could obtain) and Novarus would receive its share of any profits derived from the new business(es).[123]

To establish a claim for fraudulent inducement under Georgia law, Novarus must prove: (a) a false representation by the defendant; (b) scienter; (c) an intent to induce the plaintiff to act or refrain from action; (d) justifiable reliance by the plaintiff; and (e) damage to the plaintiff.[124]  "In general, a party alleging fraudulent

---

[122] *See* Compl. ¶¶ 35, 43, 151.

[123] Compl. ¶¶ 31, 43.

[124] *Ledford*, 618 S.E.2d at 634; *see also McDaniel v. Elliott*, 497 S.E.2d 786, 788 (Ga. 1998).  Though Defendants argue Novarus' claim is for fraud not fraudulent inducement, Novarus affirmatively pleads that Drum "willfully and intentionally misrepresented these material facts, and others, with the specific intent to induce Novarus to enter into the MIPA and the Agreement, and to cause harm to Novarus."  Compl. ¶ 151;

inducement to enter a contract has two options: (1) affirm the contract and sue for damages from the fraud or breach; or (2) promptly rescind the contract and sue in tort for fraud."[125] "By seeking reformation, the [Plaintiff] did not request the court either to rescind or ignore the writing, but to reform it, and in its reformed and proper condition to preserve, recognize and enforce it."[126]

Under Georgia law, Novarus' decision to affirm the contract has legal consequences. "Where a plaintiff 'elects to affirm a[n] [] agreement which contains a merger or entire agreement clause, he or she is precluded from recovering [from] the seller's alleged fraudulent inducement based on misrepresentations made outside the contract.'"[127] The Georgia Court of Appeals explained the rationale for this well-settled Georgia rule:

---

*see also* Compl. ¶ 35 ("Atticus and Drum made these representations to induce Novarus to sell.").

[125] *Ainsworth v. Perreault*, 563 S.E.2d 135, 137 (Ga. App. 2002).

[126] *Harkins v. Channell*, 618 S.E.2d 129, 132 (Ga. App. 2005) (internal citations and quotations omitted); *see also* Pl.'s Suppl. Br. at 8 n.2 (admitting "Plaintiff has not sought rescission.").

[127] *Curtis Inv. Co., LLC v. Bayerische Hypo-Und Vereinsbank, AG*, 341 Fed. App'x 487, 493 n.3 (11th Cir. 2009) (quoting *Ainsworth*, 563 S.E.2d at 132); *see also Eco Sols., LLC v. Verde Biofuels, Inc.*, 2011 WL 13135279, at *17–18 (N.D. Ga. Feb. 1, 2011) (rejecting under Georgia law a claim for fraudulent inducement "[b]ecause the Agreements, as affirmed by [the movants], contain or incorporate the merger clause, [so] [the movants] cannot now recover for alleged fraudulent inducement based on misrepresentations made outside the Agreements." (citing *Curtis*, 341 Fed. App'x at 493 n.3)); *WirelessMD*, 610 S.E.2d at 358–59 (same).

In an action for fraud, if the defrauded party has not rescinded but has elected to affirm the contract, he is relegated to a recovery in contract and the merger clause will prevent his recovery. This result obtains because where the allegedly defrauded party affirms a contract which contains a merger or disclaimer provision and retains the benefits, he is estopped from asserting that he relied upon the other party's misrepresentation and his action for fraud must fail. Stated another way, the entire agreement clause operates as a disclaimer, establishing that the written agreement completely and comprehensively represents all the parties' agreement. Thus, if the contract contains a merger clause, a party cannot argue they relied upon representations other than those contained in the contract.[128]

Both the Operating Agreement and the MIPA contain merger clauses with substantively identical language: "[t]his Agreement . . . constitute[s] the entire agreement of the parties hereto and supersede[s] all prior agreements, understandings and representations, both written and oral, between the parties with respect to the subject matter hereof."[129]  Language substantively identical to the

---

[128] *Authentic Architectural Millworks v. SCM Gp. USA*, 586 S.E.2d 726, 729 (Ga. App. 2003); *see also Pennington v. Braxley*, 480 S.E.2d 357, 360 (Ga. App. 1997) (explaining that, "[w]hile an entire agreement provision may, in some instances, result in a waiver of claims, the parties to the contract have ultimate control over its impact by reducing all the vital terms of their contract to writing. Also, a party signing a contract containing an entire agreement clause is not absolutely bound by it. If that party later learns of a fraud that induced the contract but is not reflected in the contract's terms, the party has the choice of rescinding the contract and suing on the fraud or affirming the contract and being bound by its terms. The entire agreement clause will bar the fraud claim only in the latter instance.").

[129] MIPA § 13.7; *see also* Operating Agreement § 14.06(a) ("This Agreement . . . constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter, including the Original Agreement.").

merger clauses in the Operating Agreement and MIPA has been characterized by Georgia courts to be "comprehensive."[130] "The Georgia Supreme Court has held that, where a contract includes a [comprehensive] merger clause, a plaintiff cannot reasonably rely 'upon any pre-contractual representation that was not also included in the [contract's] language,' and therefore cannot 'have been deceived by such pre-contractual representations.'"[131]

---

[130] *See First Data POS, Inc. v. Willis*, 273 Ga. 792, 792 (Ga. 2001) (rejecting a fraudulent inducement claim due to a comprehensive and unambiguous merger clause reading: "[The] Agreement . . . constitutes the entire agreement between the parties with respect to the subject matter contained herein and supercedes all prior agreements and understandings, both oral and written by and between the parties hereto with respect to the subject matter hereof."); *Flip Face U.S.A, LLC v. Alexandria Moulding, Inc.*, 2016 WL 8844255, *1 (N.D. Ga. Jan. 4, 2016) (characterizing the merger clause in *First Data* as "comprehensive" and holding that the merger clause before the court was substantively analogous, reading: "this Agreement constitutes and contains the entire agreement between the Parties, and supersedes any and all prior negotiations, agreements, conversations, correspondences, understandings, and letters . . . "); *Eco Sols.*, 2011 WL 13135279, at *11, *18 (rejecting a fraudulent inducement claim under Georgia law based on the presence of a merger clause reading: "Entire Agreement. This Agreement is the final expression of, and contains the entire agreement between, the parties with respect to the subject matter hereof and supersedes all prior understandings with respect thereto. No other agreement, statement, promise, proposal, tender, or letter agreement related to the subject matter of this Agreement which is not contained herein shall be valid or binding." (emphasis removed)).

[131] *Eco Sols.*, 2011 WL 13135279, at *16 (quoting *First Data*, 273 Ga. at 795 (2001)); *but see Raysoni v. Payless Auto Deals*, 766 S.E.2d 24 (Ga. 2014) (concluding that a merger clause expressly limiting itself to oral representations did not bar reliance on pre-contractual written representations as a matter of law). In this regard, Georgia law differs from Delaware law. Under Delaware law, an integration clause without clear anti-reliance language will not bar claims of fraudulent inducement based on knowingly false extra-contractual representations of fact regardless of whether the plaintiff has elected to affirm or reject the contract. *See Abry P'rs V, LP v. F&W Acq. LLC*, 891 A.2d 1032, 1056–59 (Del. Ch. 2006).

While acknowledging the settled Georgia authority regarding the relationship between merger clauses and extra-contractual fraud claims, Novarus argues that a merger clause will only preclude a fraud claim when the prior or contemporaneous representations *contradict* the written contract, and neither the Operating Agreement nor the MIPA speaks to the actions Drum misleadingly suggested he would take on the Company's behalf in the future.[132]  Novarus is wrong.  In *WirelessMD, Inc. v. Healthcare.com Corp.*, the Georgia Court of Appeals considered a claim that a health care company fraudulently induced the plaintiff to sell its software by failing to follow-through on its extracontractual promise that it would market that software

---

[132] In support of its proposition that Georgia requires a conflict between a specific contractual provision and an alleged oral representation, Plaintiff relies exclusively on selectively quoted language from a single Georgia case, *First Data*, 273 Ga. 792.  To be sure, the Georgia Supreme Court in *First Data* relied on a merger clause to reject a fraud claim based on extracontractual misrepresentations that conflicted directly with the agreement at issue.  *Id.* at 795.  But the Georgia Supreme Court also stated more broadly that the merger clause at issue "put appellees on notice that the Agreement's terms superseded *any and all* prior representations not contained therein. . . . [Thus,] [u]nder the express terms of the Agreement, appellees could not have reasonably placed their reliance upon *any* pre-contractual representation that was not also included in the Agreement's language, and thus appellees could not have been deceived by such pre-contractual representations." *Id.* at 794–95 (emphasis added).  The merger clause at issue there provided, "[the] Agreement . . . constitutes the entire agreement between the parties with respect to the subject matter contained herein and supercedes all prior agreements and understandings, both oral and written by and between the parties hereto with respect to the subject matter hereof." *Id.* at 792.  As later opinions explained, the court viewed that language as "comprehensive" and, therefore, the clause "precluded *any* subsequent claim of deceit based upon pre-contractual representations." *Flip Face*, 2016 WL 8844255, at *4 (emphasis added); *see also Novare Gp., Inc. v. Sarif*, 718 S.E.2d 304, 309 (Ga. 2011) (citing *First Data* for the broadly-worded proposition that, "[w]here a purchaser affirms a contract that contains a merger or disclaimer provision, he is estopped from asserting reliance on a representation that is not part of the contract.").

41

once acquired.[133]  The court held that "none of the[] [Agreement's] provisions is inconsistent with [the alleged future promise]," but nonetheless rejected a fraudulent inducement claim based on the presence of a comprehensive merger clause.[134]

The same logic applies here: while Atticus purchased an 80% interest in the Company, neither Atticus nor Drum made any contractual guarantees that either would make good on Drum's alleged oral representations.  To the contrary, they expressly disclaimed a responsibility to expand the Company's operations through Sections 8.05 and 13.01 of the Operating Agreement.  As this was the document governing the control and operations of the Company, Novarus could (and should) have negotiated for provisions requiring Defendants to take certain actions allegedly promised by Drum, or at least providing Novarus some measure of say over whether those actions would be taken.  It did not.  Instead, Novarus sold 80% of its interest in the Company in exchange for roughly $16 million and rights to 20% of future cash flows generated by the Company's assets.  In exchange, Defendants secured control of the Company and broad discretion in how they would operate the business.  By including a merger clause in both Agreements, which Novarus voluntarily signed (and has reaffirmed through this action), the parties also agreed to foreclose the

---

[133] 610 S.E.2d 352, 354–55 (Ga. App. 2005).

[134] *Id.* at 358–59.

possibility that Novarus could hold Drum legally accountable for oral representations not integrated in those contracts.

In sum, "[b]ecause the [Operating Agreement] has not been rescinded, the [Plaintiff]'s fraud claim can only survive if it can show misrepresentations by the Defendants that are actually contained in the [Agreements]."[135] Novarus admits that Drum's alleged oral misrepresentations are not contained in the operative contracts.[136] It follows that Plaintiff's fraudulent inducement claim fails as a matter of Georgia law.

## F. Implied Covenant of Good Faith and Fair Dealing (Count VI)

Finally, Novarus alleges in Count VI that the Company breached the implied covenant of good faith and fair dealing by paying to Atticus more than the maximum management fee allowed under the Operating Agreement.[137] "The requirement that a party exercise good faith and honest judgment, even where the contractual language grants the party discretion, arises from the implied duty of good faith and fair dealing imposed upon virtually every contract under Georgia law."[138] "[W]here

---

[135] *In re Bay Circle Props., LLC*, 593 B.R. 14, 25 (Bankr. N.D. Ga. 2018) (citing *WirelessMD*, 610 S.E.2d at 358–59).

[136] Pl.'s Answering Br. at 40–41 ("Drum's misrepresentations . . . do not contradict the terms of the Operating Agreement.").

[137] Compl. ¶¶ 157–65.

[138] *Cap. Health Mgmt. Gp., Inc. v. Hartley*, 689 S.E.2d 107, 112 (Ga. App. 2009).

the manner of performance is left more or less to the discretion of one of the parties to the contract, he is bound to the exercise of good faith."[139] "What constitutes good faith is a question for the finder of fact."[140] In this regard, "where a decision is left to the discretion of a designated entity, the question is not whether it was in fact erroneous, but whether it was in bad faith, arbitrary or capricious so as to amount to an abuse of that discretion."[141] But, "if an agreement by its express terms grants a party absolute or uncontrolled discretion in making a decision, then no duty of good faith is implied as to that decision and[] there can be no breach of the agreement predicated on the decision."[142]

Section 8.06 states, "[t]he Manager shall be compensated for its services . . . and the Company shall pay to the Manager . . . compensation *up to* ten percent (10%) of the Company's gross operating revenue per year . . . ."[143] In pressing for dismissal

---

[139] *Hunting Aircraft, Inc. v. Peachtree City Airport Auth.*, 636 S.E.2d 139, 141 (Ga. App. 2006) (emphasis removed) (internal citations and quotations omitted); *see also* O.C.G.A. § 13–4–20 (providing that, "to be effectual," performance of a contract "must be substantially in compliance with the spirit and the letter of the contract and completed within a reasonable time.").

[140] *Hunting Aircraft*, 636 S.E.2d at 141.

[141] *MacDougald Const. Co. v. State Hwy. Dept.*, 188 S.E.2d 405, 406 (Ga. App. 1972).

[142] *Planning Techs., Inc. v. Korman*, 660 S.E.2d 39, 42 (Ga. App. 2008); *see also Automatic Sprinkler Corp. v. Anderson*, 257 S.E.2d 283, 284 (Ga. 1979) ("[I]t is possible to so draw a contract as to leave decisions absolutely to the uncontrolled discretion of one of the parties and in such a case the issue of good faith is irrelevant.").

[143] Operating Agreement § 8.06 (emphasis added).

of the implied covenant claim, Defendants rest on their argument that, because the Operating Agreement's language provides Atticus discretion in determining its fee, Novarus' invocation of the implied covenant fails as a matter of law.

Section 8.06 does expressly grant discretion to the Company in determining the *amount* of Atticus' fee, but not in the manner by which the fee will be calculated.[144]  Under Georgia law, "the general rule" is that "the duty of good faith is implied in all contracts," and a grant of discretion displaces the implied covenant only when "the contract *expressly* (not impliedly) provides otherwise."[145] In *Automatic Sprinkler*, for example, the Georgia Supreme Court found no room to imply a duty of good faith where the contract provided that an "award of any direct incentive compensation is *entirely* within the discretion of the corporation."[146]  The court compared that language to the "more ambiguous" language in *Montgomery Ward & Co. v. Reich*,[147] which read: "[Y]our eligibility for Extra Compensation and the amount thereof, if any, shall be at the discretion of a Bonus Committee. . . . The

---

[144] *Id.* ("[t]he Manager shall be compensated for its services . . . and the Company shall pay to the Manager . . . compensation *up to ten percent (10%)* of the Company's gross operating revenue per year . . . ." (emphasis added)).

[145] *Hunting Aircraft*, 636 S.E.2d at 142 (emphasis added).

[146] 257 S.E.2d at 284 (emphasis added) (citation and internal quotations omitted).

[147] 282 P.2d 1091 (Colo. 1955).

decision of the Bonus Committee shall be final and binding."[148]   After the comparison, the court concluded that, while the "*entirely* within the discretion" language in *Automatic Sprinkler* expressly disclaimed a duty of good faith,[149] the operative provision in *Montgomery Ward* implied "that the bonus committee will act upon a sound judgment and it is, of course, precluded from arbitrary or oppressive action."[150]

The language at issue here is more like *Montgomery Ward* than *Automatic Sprinkler*, as it does not include an adverb anything like "entirely" to qualify the degree of discretion afforded to the Company when calculating Atticus' Manager fee.  Rather, Section 8.06 links the fee to "compensation for [Atticus'] services," which lends itself to implying a duty of good faith.  For that reason, Novarus' claim for breach of the implied covenant is not precluded as a matter of law by any express disclaimer of that obligation in the Operating Agreement.

Even so, to sustain an inference that the Company violated the implied covenant of good faith, Novarus must allege some factual predicate from which the Court can justify that inference.[151]  Novarus proffers two facts it contends allow the

---

[148] *Id.* at 1092 (internal citation and quotations omitted).

[149] *Automatic Sprinkler*, 636 S.E.2d at 869.

[150] *Montgomery Ward*, 282 P.2d at 1093; *Automatic Sprinkler*, 636 S.E.2d at 869.

[151] *See White v. Wachovia Bank, N.A.*, 563 F. Supp. 2d 1358, 1364 (N.D. Ga. 2012) (applying Georgia law and denying a motion to dismiss a claim for breach of the implied

Court to infer the Company breached its implied covenant of good faith. First, Novarus alleges the Company continued to pay Atticus the full 10% of gross operating revenue even after it learned that the executed version of the Operating Agreement mistakenly swapped out "net" for "gross."[152] Second, Novarus alleges the management fees charged by Atticus "are approximately double the management fees that were historically paid by Novarus and the Seller entities. The fees are vastly in excess of the actual costs of managing these entities as shown by historical performance."[153]

Having well pled these facts, under Georgia law, Novarus has stated a viable claim for breach of the implied covenant. As noted, Novarus has described in its Complaint, and incorporated by reference, emails that allow a reasonable inference that Section 8.06 is the product of mutual mistake. And yet, the Company continued to pay Atticus the full 10% of gross operating revenues even after the mistake was brought to its attention. It is reasonable to infer, based on the Company's intentional use of the wrong metric to calculate Atticus' compensation, resulting in double the fees that are justified for Atticus to manage the operations of the Massage Envy

covenant of good faith only after finding plaintiffs sufficiently alleged the defendant abused its discretion to determine the order in which transactions are paid by taking actions to maximize overdraft fees charged to plaintiff).

[152] Compl. ¶¶ 65, 161–64.

[153] Compl. ¶ 68.

clinics acquired by the Company, that Atticus' compensation was calculated purely to enrich itself at Novarus' expense. "'Good faith' and 'reasonableness' do not comprehend arbitrary or capricious reasons, considerations based on pecuniary gain, or merely personal preferences; rather, they refer to 'considerations of fairness and commercial reasonableness.'"[154]

Defendants' motion to dismiss Count VI is denied. "The [implied covenant] claim may not survive the summary judgment stage, however, if discovery establishes that [the Company's award of management fees] was commercially reasonable."[155]

## III. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED as to Counts IV and V. It is also GRANTED as to Count III insofar as that Count seeks to hold Atticus accountable for its willful taking of corporate opportunities. Otherwise, the motion is DENIED.

**IT IS SO ORDERED.**

---

[154] *Hunting Aircraft*, 636 S.E.2d at 141.

[155] *White*, 563 F. Supp. 2d at 1365–66 (allowing an implied covenant claim to survive a motion to dismiss because the court could not find, as a matter of law, that a bank faithfully exercised its contractual discretion under a contract).